IN THE MATTER OF J. A. MAGOON, an Attorney at Law.

### ORIGINAL.

SUBMITTED JULY 28, 1903.        DECIDED AUGUST 10, 1903.

### FREAR, C.J., GALBRAITH AND PERRY, JJ.

An attorney should not be punished quasi-criminally in a proceeding for disbarment or suspension instituted by the Attorney General for charging his client a fee which the court deems excessive, even though the client is an aged man of weak mind and easily influenced, when it appears that the client is satisfied, that the attorney acted honestly and in good faith, and that he did not use threats or other improper methods to induce the payment of the fee, and that there is fair ground for a difference of opinion as to the reasonableness of the fee.

### OPINION OF THE COURT BY FREAR, C.J.
(Galbraith, J., dissenting.)

The introductory facts and circumstances of this case are set forth so fully in Mr. Justice Galbraith's opinion in this ca e and in the opinion in *Kellett v. Sumner*, known as the *Ropert* case, ante 76, and *In re Humphreys, ante* 155, and *In re Davis*, filed this day, that little need be added here.

Two charges are made against the respondent in this disbarment proceeding. It is conceded that one is not sustained and no further notice will be taken of that. The other is in substance that the respondent was guilty of gross professional impropriety and misconduct in inducing Sumner to pay at the conclusion of the Ropert case a fee that was grossly excessive under the circumstances, namely, a fee of $4,000. The allegations as to the fee of $2,500 in the guardianship and injunction cases is made not as a separate charge but merely as introductory to or as having some bearing upon the charge as to the $4,000 fee.

The theory of this case is that the respondent has been guilty of such professional misconduct as to warrant dealing with him quasi-criminally. This is not an action by the attorney for his fees, in which he could recover only what his services were reasonably worth—in the opinion of the court or jury upon the evidence, nor is it a proceeding by the client to set aside the transaction or to recover the excess paid, because of fraud or undue influence, actual or presumed, nor is it a proceeding in which the court is asked to determine what may properly be paid as a reasonable fee by a guardian, administrator or trustee, nor is it even a summary proceeding brought by a client asking the court to exercise its summary jurisdiction over attorneys to compel his attorney to pay to him moneys unjustly withheld. It comes nearest to this last mentioned proceeding—in which the court may act upon the basis of the conduct of the attorney as distinguished from the reasonableness of his claims, and yet it is not such a proceeding. It is not brought by or at the instance of the client nor is there any prayer for such relief nor was any evidence introduced on that theory to show how much of the fee was excessive or how much should be returned to the client. And if such a summary proceeding for the enforcement of the client's alleged rights would be proper in a case of this kind, that is, to compel the return of the excess in the amount of a fee (in this instance,

not a fee retained by the attorney out of the proceeds collected but a fee paid voluntarily by the client after payment to him of such proceeds), would not the complaint have to be dismissed and the client left to his action if it appeared that the attorney acted in good faith and not dishonestly? In *Rule on Kennedy,* 120 Pa. St. 497, 502, the court said, quoting in part from an earlier Pennsylvania case:

" 'If the client is dissatisfied with the sum retained, he may either bring suit against the attorney or take a rule upon him. In the latter case the court will compel immediate justice or inflict summary punishment upon the attorney, if the sum be such as to show a fraudulent intent. But if the answer to the rule convinces the court that it was held back in good faith and believed not to be more than an honest compensation, the rule will be dismissed and the client remitted to a jury trial.' And we may add to this that a man does not lose his right to trial by jury because he is an attorney-at-law. Where an issue of fact is fairly raised between himself and his client he is as much entitled to such trial as any other citizen."

The Supreme Court of the United States said, per Mr. Justice Bradley, in the case of *In re Paschal,* 10 Wall. 483, 491:

"If an attorney have collected money for his client, it is *prima facie* his duty, after deducting his own costs and disbursements, to pay it over to such client; and his refusal to do this, without some good excuse, is gross misconduct and dishonesty on his part, calculated to bring descredit on the court and on the administration of justice. It is this misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money, in conformity with his professional duty. The application against him in such cases is not equivalent to an action of debt or assumpsit but is a quasi criminal proceeding, in which the question is not merely whether the attorney has received the money, but whether he has acted improperly and dishonestly in not paying it over. If no dishonesty appears the party will be left to his action. The attorney may have cross demands against his client, or there may be disputes between them on the subject proper for a jury

or a court of law or equity to settle. If such appear to be the case, and no professional misconduct be shown to exist, the court will not exercise its summary jurisdiction."

It is true that attorney and client sustain a confidential relation towards each other and that in consequence when dealings between them are sought to be set aside the burden of proof is shifted to the attorney to show that the transaction is fair and reasonable, but not only is this not such a proceeding but even when such transactions are set aside on the presumption of undue influence, it is not cause for the disbarment or suspension of the attorney so long as he has acted honestly and in good faith. The transaction in such case is treated as it would be if it were between others in confidential relations, and the parties are left to their civil remedies.

The question then is whether the respondent acted in such a way as to call for punishment quasi-criminally. Is such conduct shown by what was actually done to induce the payment of the fee, and, if not, was the fee itself so grossly excessive as to show such conduct irrespective of what was done by the respondent to induce its payment? It would seem that there could be but one answer to the first of these questions. The evidence (for the prosecution as well as for the respondent) shows that the respondent did not say a word to Sumner about fees until after the conclusion of the Ropert case and after the proceeds of that case were deposited to Sumner's credit in the bank; that he then said to Sumner that he thought that they ought to make some settlement as to his fee; that Sumner then asked how much he wanted, to which the respondent replied that he preferred to leave it to him (Sumner); that Sumner said he thought $2,500; that the respondent, who was, as he says, surprised and had in mind $5,000 as a proper fee, called his (Sumner's) attention to the amount of work that he had done and particularly to a number of other suits and matters besides the Ropert suit in which he had acted for Sumner and said that he thought that $4,000 would be a very fair and

reasonable fee, to which Sumner replied that it was all right
and that he was perfectly satisfied; and that the respondent
then said that if he (Sumner) were not satisfied, he, the res-
pondent, wished him to say so and be frank with him, but that
Sumner said, no, he was perfectly satisfied, it was all right.
All of this took only a few minutes. Sumner soon afterwards
told his nephew, R. W. Davis, with whom he was living and
with whom he talked over everything at that time and in whom
he seemed to have complete confidence, that he was satisfied.
He likewise told the Attorney General the same thing when
the latter made inquiry of him preparatory to bringing this
proceeding. He reiterated it several times on the witness stand
in this proceeding,—that he was satisfied when he paid the fee
and was still satisfied, though he also said (but just after he
had been asked why he had paid the respondent $4,000 and
his associate counsel $2,000, the latter of whom had threatened
to suit him) that he was afraid that if he refused they might
bring a suit against him and that he felt within him that the
sum of four thousand dollars was too large but that he did
not say so. It looks much as if this last idea were an after-
thought, but suppose it were not, there was nothing at the time
to indicate to the respondent that Sumner had any such thought
"within him." What should the respondent have done? Who
should name, or at least suggest, the amount of an attorney's
fee if not the attorney himself? Where should he do so if
not in his office? When should he do it, if not when the litiga-
tion is terminated (or before), even if his client is then in
a happy frame of mind over his victory? Sumner seems still
to be in that frame. How long should the attorney wait, espe-
cially when his client, as in this case, was about to leave the
Territory for an indefinite period to return to his home in
Tahiti? Sumner evidently looked upon the respondent as
the one who had brought that suit to a successful termination,
and was much pleased with his work in that and other matters
and apparently is still pleased. He looked upon the respondent

in a very different light from that in which he looked upon the respondent's associate counsel. He himself proposed to pay the respondent $2,500 but held out long and strenuously against paying the associate more than $1,500 and readily acquiesced in paying the respondent $4,000 when the latter called his attention to all the services that that fee was to cover.

Now as to the amount of the fee. It was for the services of the respondent as leading counsel in the Ropert case—a case involving $48,025 and some real property, valued at from ten to twenty thousand dollars, all of which was secured to Mr. Sumner. It was a most hotly contested case, involving difficult questions of law and fact, and one in which the respondent was subjected to much personal abuse by opposing counsel. The fee was also for services in defending an action of assumpsit for about $2,700 and $700 interest, which required several days of trial before the jury, resulting in a verdict against Sumner for about $1,500. It covers services to be rendered on the appeal in that case in the Supreme Court, and, on a new trial, if one is ordered, and on a second appeal, if one is taken, and so on to the termination of the case. It covers services in successfully defending Sumner in a proceeding to have him placed under guardianship, as an insane person, and all services to be rendered on appeal and further trials or hearings, if any, thereafter. It covers services rendered in procuring for Sumner the $48,025 from Sumner's trustee, the settlement of the account with the trustee, the cancellation of a will, the drafting of a conveyance from the trustee to Sumner (all this before the Ropert suit was begun), the subsequent drafting of a power of attorney from Sumner to the respondent, the drafting of a trust deed from Sumner to R. W. Davis covering thirty or forty thousand dollars worth of property, the adjustment of a number of claims against Sumner without suit, &c., &c. It is true Mr. G. A. Davis, respondent's associate, had already received $2,000 as his fee, but that apparently was excessive for his services in the Ropert case alone,

and in so far as it was excessive and obtained by undue influence it need not be considered in connection with the respondent's fee. Mr. Davis also did not come into the case at the start. The respondent was leading counsel, and, besides himself, two other attorneys in his office devoted much time to the case. The matters outside of the Ropert case which the respondent's fee also covered were not covered by Mr. Davis' fee. While the fee paid to the associate counsel should be taken into consideration the fee for both leading and associate counsel together should be greater than the fee for one alone should be if there were no associate. Now, in our opinion the respondent's fee was excessive even for all the services rendered and to be rendered. But is that material in this case? If every attorney is to be liable to disbarment or suspension whenever he charges a fee that is excessive in the opinion of the court or otherwise acts on a view in which the court differs from him in opinion, the profession will be a pretty dangerous one to follow. An attorney should be allowed considerable scope for the exercise of judgment. Much leeway should be allowed for honest difference of opinion—especially in proceedings of a quasi criminal nature. If we may judge from the present run of fees among the members of the bar, which apparently are somewhat higher now than they were ten or even five years ago, and often, in our opinion, altogether too high; if we may judge from the testimony given by leading members of the bar as to proper fees in cases involving that question in the courts from time to time, we may safely affirm that a considerable portion of the bar, including some of those of highest standing in point of both ability and character, would, if called upon, testify that the fee in question was not unreasonable, considering the various suits and other matters covered by it, the services yet to be rendered and uncertain in extent as well as those already rendered, the amount and difficulty and responsible nature of the work, the large amounts involved and the success attained, not to mention the absence of a re-

tainer in the first instance and the doubt as to what compensation would be obtained in view of Sumner's lack of funds outside of those involved in the suit. The respondent even advanced money for Sumner's support during the litigation. If we consider awards of fees made by Circuit Judges on various occasions (in our opinion clearly excessive) we should have to say that the fee in question is very moderate by comparison. Even if we compare the fees allowed by this court in some cases, and we do not mean to imply that they were not too large in any instances, it may be a question whether it is excessive, at least to any greater extent. No doubt the last few years have furnished instances of excessive fees sufficiently to amount almost to a scandal in the eyes of a large portion of the community and of the bar itself, and the Sumner litigation is not the least notorious in this respect. But that is no reason why the respondent should be punished quasi-criminally upon an occasion when, as seems to be the case here, the fee was asked in good faith and is such that there might be a fair difference of opinion as to its reasonableness? There is no doubt that the fee in question covered all the matters referred to. Sumner as well as the respondent says that that was the agreement at the time, and the receipt which was given afterwards, but before this proceeding was thought of, specifically so states. The receipt was not given at the time either because it was thought unnecessary or because the respondent had to hurry into court. When it was given, which was in July, about a week or so before this proceeding was begun, it was dated July 26 by mistake for June 26, the day on which the fee was paid.

Of course if Mr. Sumner were a man of ordinary strength of mind, it would be preposterous to hold that the respondent should be punished for charging a fee of this amount under the circumstances. The only serious difficulty in the case would seem to arise from the fact that he is an aged man of weak mind and easily influenced. There is no doubt of this—as shown by his inability again and again to escape imposition in

the management of his property—although two Circuit Judges have recently held that he was sane, and a large number of the leading physicians, lawyers and business men of this city have certified to his sanity. The respondent contends that Mr. Sumner, while appearing in an unfavorable light, indeed, at his worst, on the witness stand, seems as rational as others in private conversation, and that, while credulous and easily misled by flattering promises, he is strong minded in the sense that he knows what he wants or does not want and that when he makes up his mind as to that, nothing can move him. There seems to be much truth in this contention,—to judge from the evidence in the various Sumner cases that have come before us. But it is unnecessary to attempt a psychological analysis of Mr. Sumner—a problem which has puzzled many and led to diverse opinions. It no doubt makes a great difference how Mr. Sumner is handled. He must be dealt with, if successfully, in peculiar ways, but that does not show that he is not weak minded and easily influenced. It merely shows that his weak points must be discovered and appropriately played upon. That he cannot endure prolonged mental strain is evident. But how does all this affect the question now before us? If the respondent could have asked a fee of like amount for like services of one in normal mental condition without being subject to quasi-criminal proceedings, could he not of Mr. Sumner? In the one case there might perhaps be a recovery of part in an appropriate proceeding if it should be decided that the fee was excessive, and in the other, not. But can it make any difference in a proceeding of this kind so long as the charge was made honestly and in good faith. Mr. Sumner was not under guardianship. Could not the respondent properly charge the client who employed him what he thought was a reasonable fee? And it seems clear that the respondent thought this a reasonable fee. Must he first have seen that Sumner had legal advice as to the amount of the fee? There is no rule of law requiring that, and should the attorney, if any, called upon to advise him as to

that fee likewise see that Sumner had further legal advice as to his, the second attorney's, fee and so an *ad infinitum?* No doubt it would have been appropriate, if nothing more, for the respondent himself to have sought advice in a friendly way of brother attorneys or perhaps even of a judge as to what would be a reasonable fee under the circumstances, but there was no obligation on him to do so. That is not infrequently done even in respect of fees charged men of unquestioned mental soundness. Even such men often pay without objection what they consider excessive fees because the attorneys charge them. In the present case Mr. Sumner both at the time and afterwards, when there was no reason whatever for saying so if he did not feel so, said that he was perfectly satisfied. The respondent could not have made it easier for him to object if he had cared to. There was room for an honest difference of opinion as to the reasonableness of the amount. Under such circumstances, how can the court inflict a penalty in a proceeding of this kind—merely because it differs in opinion from the attorney as to the reasonableness of the charge?

The complaint is dismissed.

*Attorney General L. Andrews* and *W. S. Fleming* in support of the complaint.

*Respondent* in person; *J. Lightfoot* also for the respondent.

### DISSENTING OPINION OF GALBRAITH, J.

This is one of the series of disbarment proceedings growing out of the recent litigation concerning the proceeds of the sale of the John K. Sumner reef property to the Oahu Railway and Land Company.

It is charged in the information filed by the Attorney General that J. Alfred Magoon, a member of the bar of this court, "has been guilty of professional improprieties, malpractice and gross misconduct," setting out specific charges. It will be necessary here to consider only the specifications that find support in the evidence.

These are as follows: 1. "That on or about the 4th day of September, 1902, one Maria S. Davis brought an action before a judge of the Circuit Court of the First Circuit, of the Territory of Hawaii, to declare her brother, John K. Sumner, *non compos mentis,* and to put him under guardianship, as an insane person; that on the trial of said action, said J. A. Magoon appeared as one of the attorneys for Maria S. Davis; that thereafter, and on or about the 13th day of October, 1902, the said action was compromised and settled by the said Maria S. Davis receiving from John K. Sumner the sum of ten thousand dollars for herself, and five thousand dollars for the payment of her attorneys. That the said J. A. Magoon, for his services in said action, received the sum of two thousand five hundred dollars."

2. "That the said John K. Sumner was a man of upwards of the age of 84 years, with little or no knowledge of business, or the value of money, and, by reason of his great age and lack of knowledge, was easily influenced and controlled, all of which facts were well known to the said J. A. Magoon."

The information after reciting that subsequent to the settlement of the guardianship suit Magoon was employed by Sumner as one of his attorneys in the Ropert-Sumner case, a suit in equity in the First Circuit Court, involving the construction of the trust deed from Sumner to the Bishop and the ownership of the $48,025, the remainder of the proceeds of the sale of the reef property, and that on January 12, 1903, that suit was decided in favor of Sumner by the Circuit Judge and that on appeal to this court that decision was affirmed on June 25, 1903, charges further,

3. "That on or about the 26th day of June, 1903, said J. A. Magoon persuaded and induced said John K. Sumner, although well knowing his weakness and inability to understand financial matters, to pay him a fee for his services in the aforesaid case of Ropert v. Sumner the sum of four thousand dollars, he, the said J. A. Magoon, well knowing that said John K. Sumner had paid George A. Davis the sum of two thousand dollars as associate counsel with said J. A. Magoon in said case, and that he, the said J. A. Magoon, and the said George A. Davis had just prior thereto, and on or about the 13th day of October, 1902, obtained from the said Sumner the sum of five

thousand dollars for legal services in the suit of Maria S. Davis above named."

"And complainant charges that said fee was grossly excessive, in view of the services rendered, and the amount of money recovered, as well as the amount of money previously paid by said John K. Sumner to said J. A. Magoon and George A. Davis, and that said Magoon, in inducing said Sumner to pay said fee and in taking advantage of his age and infirmities as aforesaid to charge and obtain such fee, was guilty of gross professional impropriety and misconduct."

The respondent admits the allegations made in the first charge as above set out but attempts to justify his conduct on the ground that the services rendered by him in that case were reasonably worth $2,500, and that that suit had "absolutely no connection" with the Ropert-Sumner case in which he appeared for Sumner and charged the $4,000 fee.

The only evidence on the question of the reasonableness of the fee charged in the first suit is the testimony of the respondent that it was reasonable and the record in the case, so far as the record shows there was no intricate or difficult questions of law involved in the guardianship suit. It appears to have been a simple probate case and although the trial extended over nine or ten days I could not find as a matter of law or fact that five thousand dollars was a reasonable fee for two firms of attorneys appearing for the petitioner in that case. While the guardianship and Ropert-Sumner suits were separate and distinct actions I cannot find that they were absolutely disconnected. The attorneys' fees in each case were paid by J. K. Sumner and from the same fund, namely, the one hundred and ten thousand dollars paid for the reef property. So far as the attorneys' fees and John K. Sumner are concerned the suits were intimately connected.

As to John K. Sumner's mental and physical condition and inability to take care of his own as charged in the second allegation of the information the "respondent admits that John K. Sumner is a man of upwards of the age of eighty-four years, but denies that he has little or no knowledge of business or the

value of money; and further denies that by reason of his great age and lack of knowledge, he is easily influenced and controlled. On the other hand respondent affirms that said John K. Sumner is a man of large business experience for one in his walk of life, and with his education and opportunities. Respondent believes that J. K. Sumner has a keen appreciation of the value of a dollar, is economical and saving, but respondent further believes that said J. K. Sumner is sometimes inclined to be too credulous to those who hold out flattering offers to him. That said J. K. Sumner is a man of strong will and firm purpose, and cannot be easily influenced by threats or promises to do that which he has set himself against, or which he thinks is improper." This quotation is made from the sworn answer of the respondent. It is supported by the testimony of the respondent at the hearing and is opposed. 1. By allegations made by the respondent in certain sworn pleadings filed in the Circuit Court of the First Circuit, namely, in the bill of John K. Sumner, a *non compos mentis,* by his next friend, *Maria S. Davis, v. M. P. Crandall* filed February 18, 1895, and offered in evidence in this case, wherein it is alleged "That the mind and memory of the plaintiff have for sometime been failing and that he is now and for some months last past has been unable to understand his affairs and to intelligently transact business." This bill is signed "J. Alfred Magoon, Solicitor for the plaintiff." Further support is found in the allegation in the petition in the guardianship case filed September 4, 1902, wherein the respondent appeared for the petitioner, and received a fee of $2,500 for so doing. "That John K. Sumner is of unsound mind and has been for several years past and has been and is unable to transact any business or in any way care for and control his property."

2. By the finding of this court in the decision rendered in the Ropert-Sumner case, the very case wherein the respondent charged the fee of $4,000 for his services, that "Sumner was an old man, weak-minded and easily influenced." There is other evidence that supports the correctness of this finding but

the foregoing is ample to sustain the allegation of the information that Sumner was, on the 26th day of June, 1903, a very old man, "with little or no knowledge of business, or the value of money, and, by reason of his great age and lack of knowledge, was easily influenced and controlled all of which facts were well known to the said J. A. Magoon."

The respondent denies the allegations made in the third count above set out and recites in detail in his answer the services rendered, the difficulties encountered and overcome in the litigation and the great value of his services to Sumner and alleges that the $4,000 fee was voluntarily and cheerfully paid by Sumner and that $5,000 would have been paid if he had insisted on it and that $4,000 for his services in the Ropert-Sumner case alone "would be a very fair and moderate fee, low fee;" that this fee was not only for his services in the Ropert-Sumner case but was in full for services rendered and to be rendered in other cases pending in court against John K. Sumner and in which the respondent was of record as counsel, namely, an assumpsit suit for $2,700 tried in the Circuit Court and in which judgment was rendered for $1,500, and now pending on exceptions to this court, and a suit of Willie Ellis to have a guardian appointed for Sumner and an application for an injunction in that proceeding; that on motion the injunction was denied and the petition for guardian was dismissed by the Circuit Judge and that appeals are now pending to this court, also for services rendered in conferring with certain of Sumner's creditors and for many other services that he cannot now recall.

The following receipt was given in evidence:

"July 26, 1903.

Received from J. K. Sumner Four Thousand Dollars. In full for professional services in all matters of litigation now pending in which I appear of record as counsel and all past services.

$4000.                    (Signed)   J. ALFRED MAGOON."

The information against the respondent in this matter was filed and served on July 24th, 1903, two days prior to the date of this receipt. The respondent claims that the date of the receipt was an error; that he wrote "July" for "June;" that he gave no receipt on the 26th of June when the $4,000 was paid and that about a week prior to the filing of the information Sumner and R. W. Davis called at his office and asked for a receipt and that the above receipt was then written and delivered to Sumner. In this testimony the respondent is corroborated by the evidence of R. W. Davis.

Aside from the date of this receipt there are circumstances that strongly indicate that the claim that this $4,000 fee was for services rendered and to be rendered in other cases as well as in the Ropert-Sumner case, was an after-thought due to publicity and the threatened investigation, and to justify the inference that the respondent charged this fee for the Ropert-Sumner case alone. In the book which the respondent purchased and opened for Sumner on June 26, 1903, intended to show his disbursements of the $48,025 are two entries, relative to this $4,000 fee, the first is: "To cash paid J. A. Magoon % Services 2,000." The second is: "To cash paid J. A. Magoon by cheque, 2,000." There is nothing in these entries to indicate that Sumner or the party making the entries for him understood that the $4,000 paid the respondent on this day was in full of services rendered even. However, the question of what services this fee was to cover, being in doubt, I am inclined to the opinion that the respondent is entitled to the benefit of the doubt and am willing to allow that this fee was paid to cover services rendered in other cases as well as in the Ropert-Sumner suit. The other cases pending were the assumpsit suit of Ah In and the guardianship and the injuction proceedings. It is claimed that $250 would be a reasonable fee in the former suit and although the respondent did not fix the amount of the fee that he believed should be allowed in the other proceedings we assume that $250 would be ample compensation for all services rendered and to be rendered in that proceeding. That leaves

$3,500 for the fee in the Ropert-Sumner case and the services of preparing papers and consulting with creditors of Sumner and passing their claims. Among the scale of charges the respondent gives to cover a part of the amount is $50 or $100 for drawing a power of attorney from Sumner to himself wherein it was provided that the respondent should be paid a commission of 5% on the gross amount of all money passing through his hands and $500 for preparing a trust deed from Sumner to R. W. Davis.

It seems that the respondent from the time of his employment in October, 1902, until the day of payment, June 26, 1903, said nothing about a fee and he was therefore entitled to charge what his services were reasonably worth not what he thought they were worth or as much as he could induce Sumner to pay him. *Reynolds v. McMillian,* 63 Ill. 46-47; *In re Dorland,* 63 Cal. 281, 282.

After the decision of this court in the Ropert-Sumner case and the $48,025 had been turned over to Sumner and deposited in the bank, Sumner was, as a matter of course, in a very pleasant frame of mind towards the respondent and it was then in the quiet of respondent's office that Sumner was asked about the fee. The respondent testifies that he had in mind to charge a fee of $5,000 but he thought that possibly Sumner would give him more so he asked Sumner what he was willing to pay and Sumner replied that he thought $2,500 about right. At this the respondent claims to have been surprised and recounted to Sumner what he had done and intended to do for him and the great value to him of respondent's services and said that he thought that $4,000 would be a proper fee. Sumner acquiesced and paid the $4,000.

Sumner testifies that while he thought $2,500 was a reasonable fee he paid the $4,000 because he thought the respondent would sue him if he refused to pay it and he did not want another law suit. The fact that Sumner after the payment expressed himself as satisfied and did not make complaint against the respondent cannot materially affect the issue in

this case between the court and one of its officers wherein the propriety of the conduct of an officer of the court is questioned.

The question is not whether or not Sumner is satisfied but whether or not respondent was guilty of gross impropriety and misconduct in accepting a fee of $4,000 under the circumstances in this case.

The charge in the information is that this fee was grossly excessive and that the respondent in inducing Sumner to pay it took advantage of his age and infirmities and was therein guilty of professional impropriety and misconduct.

If this were a suit in equity between the client and the attorney to set aside this transaction or to recover excessive fees there can be no question as to the equitable rule that should be applied. The relation of attorney and client existed at the time of the payment of this $4,000 fee between the respondent and John K. Sumner.

"The courts of England have uniformly watched all the dealings between attorneys or barristers and their clients with the closest scrutiny, and have established very rigorous rules concerning them. * * * * * The presumption always arises against the validity of a purchase or sale between the client and attorney made during the existence of the relation. The attorney must remove that presumption by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, knowledge, intention, and freedom of action by the client, and also that he gave his client full information and disinterested advice." Pomeroy's Eq. Jur. Sec. 960.

"A solicitor *may* purchase from his client, although the bargain would be subject to the most rigid scrutiny, and the *onus* of showing its fairness lies on the former; but a gift from client to counsel is absolutely void." * * * * "The general rule of public policy which discountenances transactions between persons who are situated in a confidential relation towards each other, applies with particular force to the case of attorneys at law who are officers of the court, and are, on that ground as well as on account of the powerful influence which they exercise over the minds of their clients, restrained from dealing

with those whose interest they have in charge." Bispham's Prin. of Eq. Sec. 256.

In discussing a written instrument executed between attorney and client the Supreme Court of New York said, "In such a case the right of action is not deemed to be established on the instrument, without clear proof, outside the paper, of its integrity and entire fairness. The legal presumption is against its validity, and the *onus* is on the agent and attorney to show that all was fair, and that the client acted freely and understandingly. So if an attorney bargain with his client, the burden is on him of establishing its perfect fairness, adequacy and equity; and if no proof be given, or if the proof be insufficient to meet this requirement, the court must hold the case as one of constructive fraud. (Story's Eq. Juris. Sec. 511.) The rule is the same as to dealings between client and attorney (id. 315). This is a rule of propriety and public policy. Judge Story has well said that the 'law, with a wise providence, not only watches over all transactions of parties in this predicament; but it often interposes to declare transactions void, which between other persons would be held unobjectionable;' he adds, 'it does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties.' It was decided in *Evans v. Ellis,* by the Court of Errors, (5 Denio, 640) that where the relation of solicitor and client exists, and a security is taken by the solicitor from his client, the presumption is that the transaction is unfair, and the *onus* of proving its fairness is on the solicitor. In this case Senator Spencer says, in substance, that transactions between solicitor and client are to be looked on with no favor, and should be scrutinized with the utmost rigor; and Beardsley, J. says that no security given by a client to his solicitor should be allowed to stand in any case, unless its fairness in every respect is shown by the solicitor. The presumption in such cases is against the fairness of the transaction, and the burden of proof to repel the presumption is on the solicitor. He must show he gave value for it." *Brock v. Barnes,* 40 Barb. 521, 527, 528.

In *Tyrrell v. Bank of London,* 10 H. L. Cas. 26, 43, the Chancellor said, "My Lords, there is no relation known to society, of the duties of which it is more incumbent upon a court of justice strictly to require a faithful and honorable observance, than the relation between solicitor and client; and I earnestly hope that this case will be one of the many which vindicate that rule of duty which has always been laid down, namely, that a solicitor shall not, in any way whatever, in respect of the subject of any transaction in the relation, between him and his client, make gain to himself at the expense of his client, beyond professional remuneration to which he is entitled."

I know of no reason why this equitable principle that looks upon the transactions between attorney and client with suspicion and that casts the burden on the attorney of showing the same to be just and fair and that he rendered full remuneration for the fee received should not be applied in this case.

The respondent has particular reasons for familiariity with this principle since this court not long since applied it in setting aside and annulling a transaction with another one of his clients, also an aged man, whose "mind works slowly," and who "was somewhat dull and simple," wherein the court found that "Mr. Magoon was acting for both parties." (*Christley v. Magoon,* 13 Haw. 402, 405, 409.)

Has the respondent sustained the *onus* cast on him by this principle and shown that the transaction was just and fair and that the services rendered and to be rendered John K. Sumner were reasonably worth the sum of $4,000? I think that he has failed to do this.

I cannot escape the conclusion that, on the 26th day of June, 1903, the respondent knew that he was dealing with his client, "an old man, weak-minded and easily inflluenced" by a person in whom the client had confidence and that the respondent then knew that he possessed the full confidence of John K. Sumner and that he was in a position where he could exercise great influence with and over John K. Sumner.

The respondent selected a most opportune time to make a satisfactory arrangement (to himself) for his fee, at the successful termination of a rather protracted suit and immediately after the fruits of the victory had been deposited in the bank subject to the client's order, and the place was also favorable for the exercise of undue influence of the attorney over his client, alone in the privacy of respondent's office, no witness being present, (except possibly one of respondent's partners), even Sumner's recent close friend and partaker of his bounty, R. W. Davis, was not there. At such a time and place the respondent induced his client John K. Sumner, to pay him a fee of $4,000. The respondent did not suggest to John K .Sumner that he take time to think about the reasonableness of the charge or consult with his friends or some disinterested person who was acquainted with the usual and customary charges for legal services in the community but seems to have hastened the consummation of the transaction. The respondent says in his evidence "I had to go away so soon, rush up to the court from my office. I partly ran, I think to get here just at ten o'clock when court opened." The money was deposited in the bank between 9:30 and 10 o'clock. The respondent after the money was deposited, went with Sumner to his office, arranged for and collected his fee of $4,000 and was at the court by ten o'clock. This did not leave much time for deliberation. The respondent, possibly thought,

> "If it were done, when 'tis done, then 'twere well,
> It were done quickly."

To establish the fairness and reasonableness of his fee the respondent gives his own testimony that it was so. He does not offer the evidence of any other member of the bar to prove that fact or to show the usual and customary charges for legal services in this community. He does refer to some particular fees allowed by the courts in certain cases but none of these are a vindication of the transaction in question. We had the record in the Ropert-Sumner case before us for some time and are rather familiar with it and from the record we can form some

reasonable idea of the value of the services rendered by the respondent in that case. It is possible that my standard of fees for legal services is not as high as that of some members of the bar. At any rate I do not place the same value on respondent's services in this case that he does. I am inclined to the opinion that it is not improbable that much of the acrimony and bitterness and many unpleasant features of the Ropert-Sumner suit and its unfortunate connections might have been avoided if the respondent had been less reckless and more cautious in his method of obtaining the money from the Bishop and in the destruction of the Will and attempted cancellation of the trust deed.

In view of the fact that the respondent and another attorney were paid a $5,000 fee by John K. Sumner in a probate case for a few days work in October, 1902, and his associate counsel in this case was paid a fee of $2,000, this $4,000 fee does seem exorbitant and excessive. It at least calls for more convincing evidence than that offered by the respondent to prove that he acted "honestly and in good faith" and that this last fee was fair and reasonable and that he "gave value for it."

What punishment should be administered to the respondent for this gross "misconduct and professional impropriety" is a difficult question. To strike the name of an attorney from the rolls and debar him from following an honored profession is a very serious matter—one that gives the court no little difficulty to determine. There is scarcely a more unpleasant duty that can come before a judicial tribunal than passing on charges of misconduct against an attorney. In such a proceeding the court owes a duty to the community no less than that to the bar; to the former protection against those who violate the obligation of the profession and misuse the office of an attorney and counsellor at law and to the latter that its fair name is not brought in to reproach by the conduct of unworthy members. The community, however, does not need protection so much against the attorney who fights in the open, even if he does happen, some time, to get on both sides of the same litigation, as against

the attorney who, when proceedings for disbarment are brought against him, expresses gratitude to the Attorney General for bringing them and casts flowers at the court which sits in judgment upon him. The attorney with "the candied tongue" is the real menace to the community and a reproach to the profession. Such an attorney is liable to deceive the credulous and to prey upon the weak and helpless.

I do not believe that the respondent, in collecting the $4,000 fee from John K. Sumner, under the circumstances above set forth, acted "honestly and in good faith." His desire was to get all he could out of Sumner without offending him, without regard to the value of the services rendered. Taking advantage of an old man in the condition of John K. Sumner, is a serious offense and certainly deserves reproof and punishment at the hands of the court. The judgment of the court sends the respondent forth "unwhipp'd of justice."