[Civil No. 4125.   Filed October 30, 1939.]

[95 Pac. (2d) 56.]

In the Matter of OTTO E. MYRLAND, a Member of the State Bar.

No appearance for Board of Governors.

Mr. Otto E. Myrland, Respondent, *in propria persona,* and by Mr. E. G. Frazier, his Attorney.

Mr. Bob Barber and twenty-seven other members of the Bar, *Amici Curiae.*

PER CURIAM.—This is a proceeding which involves the conduct of a member of the state bar, to-wit, Mr. Otto E. Myrland, of Tucson, Arizona.

The charge is that his fee for making an uncontested collection against the estate of a deceased person was excessive and unconscionable under the circumstances.

The local administrative committee of the state bar at Tucson investigated the charge and recommended that Mr. Myrland ''be disciplined by disbarment or suspension.'' This recommendation and the evidence supporting it were then forwarded to the board of governors of the state bar at Phoenix. Thereafter this board held a session and heard respondent's defense, or story, in explanation or justification of the size of the fee. The board of governors has filed the records made before the two bodies with this court for such action as seems meet and just.

The salient facts are that on March 8, 1937, a firm of lawyers composed of Dave F., Donald F. and Russell Smith, members of the Los Angeles, California bar, sent to Mr. Kirk T. Moore, a member of the bar of this state, an original and copy of a creditor's claim by the United States Tire Dealers Mutual Corporation for $1,233.26 against the estate of Carl Hero, for collection. Mr. Moore was in poor health at the time, and instead of returning the claim turned it over to Myrland to handle. In their letter of transmittal to Moore they said:

'' . . . We will appreciate it if you will inform us what your fee will be for handling this matter with the assumption that the claim will not be contested, since we know it is impossible at this time to fix a fee should a contest arise and we do not anticipate such event.

In fixing your fee you need not expect to send us the usual forwarder's fee, because you will bill this office and we will in turn bill our client, a single bill covering both your service and our own."

On March 17, 1937, respondent wrote the Los Angeles attorneys that due to an illness Mr. Moore, who had offices with him, had asked him to take care of the matter. Thereafter respondent presented the claim to the administrator of the estate, by whom it was approved and it was also approved by the court. Respondent obtained a statement of the assets and liabilities of the estate and sent such statement to the Los Angeles attorneys. This statement showed that the estate was solvent and would be able to pay 100 per cent. of its liabilities. The estate's assets being in excess of five thousand dollars, the law allowed ten months from the first publication of notice to creditors for the filing of claims against the estate and, for that reason, although the claim had been allowed and approved, it was not paid before the expiration of ten months.

On or about May 3, 1938, the administrator paid the claim to the respondent in full, and on the 3d day of May he remitted to the attorneys in Los Angeles a cashier's check for $824.51 payable to the creditor and stated in his letter of transmittal that his fee was one-third of the claim, or $412.27, which amount he retained. On May 9th the Los Angeles attorneys acknowledged receipt of the $824.51, and stated:

" . . . It has always been our custom to charge this and our other clients upon an hourly basis for work performed by us unless it is taken upon a contingent basis. The total fee which we can charge our client is only approximately $100.00 upon a matter of this sort where the sole services rendered are the preparation and filing of a claim with an executor or administrator and following it up, and from this we must pay our correspondent.

"An examination of our file indicates that we prepared the claim and your services consisted of seven letters, checking the probate file of the court upon two or three occasions, two or three conversations with the attorney for the executor, and securing and forwarding to us a copy of the inventory.

"In view of the above we are somewhat at a loss to know what to say concerning your charge of $412.27 since we anticipated a bill of less than $100.00 and any sums retained by you in excess of $100.00 must be borne out of our own pocket, and we will receive no compensation for our own services in the collection of information for and preparation of the claim and our correspondence.

"We will indeed appreciate your reviewing the amount of work done by you considering the comparatively moderate amount of the claim and determining whether or not we can reach an understanding respecting the fee."

The respondent did not answer this letter. On May 25th the Los Angeles attorneys wrote him again and he paid no attention to that letter. On June 2d the Los Angeles attorneys wrote Kirk T. Moore, calling his attention to the situation, and asked him, inasmuch as he had recommended the respondent, to discuss the matter with the latter. In this letter $75 was suggested as a fair and reasonable fee. Still no word from respondent. What Mr. Moore did, if anything, in response does not appear in the record and we assume the reason was his illness from which he did not recover.

On June 16th Donald F. Smith, a member of the Smith firm, wrote the secretary of the state bar of the situation and sent him copies of all the letters written to respondent and the answers thereto, but did not make any formal charge. The matter was referred to the president of the state bar, who, in turn, referred it to the local administrative committee at Tucson. This committee, on July 19, 1938, held an

informal meeting, to which respondent was invited. At such meeting respondent informed the committee he was endeavoring to adjust the matter and the committee, in order to give him an opportunity to do so, postponed further action for the time being.

Because he neglected and refused to settle the matter or to discuss it with the firm that had given the claim to him, on or about December 13, 1938, Donald F. Smith filed with the State Bar of Arizona formal charges, setting forth the facts as detailed above. After such filing, the administrative committee, on January 5, 1939, held a meeting at which the respondent was present, he having been duly cited to appear. He stated to the committee that he had not adjusted the matter of the fee with the Los Angeles attorneys because such attorneys would not agree to dismiss the charge. We shall hereafter refer to the Los Angeles attorneys as complainants. It seems complainants took the position that, after formal charges were filed, the matter was out of their hands and in the hands of the state bar. However, they were still willing to allow respondent a fee of $75 and would have accepted at any time the balance of $337.27 from respondent as full acquittance.

It is not an easy matter to state just what respondent's defense is. In response to the order to show cause issued by this court, he filed an informal "statement." Therein he contends that $75 was a ridiculously low fee for his services and says he did not attempt to adjust the matter as he thought it would be futile since the complainants had stated they could charge their client only $100 for the services performed by their firm and respondent. We note and quote from respondent's statement:

" . . . It is interesting to note that they (complainants) made no statement of fee limitation to the late Kirk T. Moore when the claim was forwarded to him,

nor did they make any limitation when the claim was turned over to me. .... ''

In the letter to Moore transmitting the claim is language that completely refutes this statement, for the complainants do specifically request Moore to fix his fee in advance if the claim is not to be contested. The statement is in error in assuming that complainant turned the claim over to respondent. It was turned over to him by Moore and we think any instructions sent to Moore were a limitation upon the rights of the respondent. However, he says the letter to Moore transmitting the claim was not turned over to him when the claim was. While it is of course barely possible that Moore did not turn that letter over to respondent, we think one would have to be rather credulous to conclude that he did not.

In respondent's informal statement he also makes the point that his compensation was contingent on making the collection and that contingent fees are always large. There is nothing in the record to support this contention except his statement that Moore told him the compensation was contingent. He also makes the point that forwarding attorneys customarily advise the attorney at the receiving end what the fee for success is and how it should be divided, but that the complainants failed to do that in this case. The terms upon which the claim was forwarded to Moore were that, if the claim was collectible without litigation, Moore, upon the ascertainment of that fact, should notify the forwarding attorneys what his charges would be, and if an action had to be brought the amount of the fee would be governed by the amount of time and labor given to the litigation and determined later. Respondent will be conclusively presumed to have accepted the collection of the account upon the same terms it was sent to Moore. If he was unwilling to make the collection on those terms, he

should have so advised the forwarding attorneys and made different arrangements.

Respondent's disregard of the predicament in which his charge of one-third of the claim for his services had put the forwarding attorneys was nothing less than heartless. Our observation and experience have been that lawyers generally are grateful for business sent them by other lawyers and show it by adjusting their fees so as not to penalize the sender. In other words, they do not arbitrarily fix their fees but come to an understanding with the forwarding attorney as to his agreement, if any, with his client as to the amount of the fee to be paid.

When the forwarding attorneys in this case reminded respondent that any charge over $100 would fall on them, their predicament seemed to be of no concern to him. He did not see them to talk it over nor did he write them about it—just paid no attention to their reasonable request that he discuss the matter with them. Such stolid, cruel indifference to "the hand that fed him" a fee is incompatible with the proper functioning of a lawyer. Respondent was entrusted with the collection of the claim and of course it was his duty to account for the last penny he received. He had no right arbitrarily to fix his fee and, because he was physically in possession of the $1,233.-26, retain $412.27 for what he did.

He states that he devoted a day and a half in time to this matter (counting eight hours as a day, that would be twelve work hours,) and that if his fee is fixed on a time basis, as complainants would have it, it is not unconscionable and excessive. What he did was over a period of some eleven months and consisted in filing with the administrator the verified claim sent to him and following it up until it was paid. It may be seriously doubted whether he put in twelve hours all told in making the collection. What he did

was something an ordinary law clerk could have done just as well as he, and it would seem that $412.27 for twelve hours of such service was rather a large sum.

■ There has been filed here a brief signed by twenty-eight members of the bar as *amici curiae,* in which it is contended that this is the ordinary dispute between client and attorney over the size of the latter's fee and should therefore be settled in a civil action. It is proper to say that it is not a part of the province of the state bar to take note of or to investigate the ordinary disputes and controversies between attorney and client upon complaint of the client that the fee is too large for the services rendered. The proper forum for such disputes is the courts. *Amici curiae* say:

" . . . We believe it to be a fundamental rule in matters of this kind that the charging of a fee in good faith by an attorney is not grounds for disciplinary proceedings; that in order to constitute such grounds, the charge must either be accompanied by facts amounting to fraudulent concealment or overreaching, or the size of the fee taken in connection with such facts as the circumstances or financial distress of the client amount to over-reaching, and a violation of his trust.

"The recognition of this principle, we feel, is necessary in order to enable members of the profession to practice law. The situation of attorneys will be intolerable if every dispute with a client or with other attorneys, as to the amount to be charged as a fee for services is to become the subject of disciplinary proceedings. . . . "

There are decisions that sustain this statement. Indeed, there seems to be none to the contrary, but, where the fee is so excessive and unconscionable as to indicate that it could not have been charged in good faith, the rule is different.

■ This is not a dispute between client and attorney but between the forwarding and receiving attor-

neys of an account for collection. The client, United States Tire Dealers Mutual Corporation, is out of the controversy. The attorneys into whose hands the claim was placed for collection will be required to pay to the client the amount collected less the collection fee agreed upon, or, if none were agreed upon, then a reasonable fee. If such attorneys trustfully confided in the honesty and fairness of respondent and their trust was betrayed, and a fee out of all proportion charged, it is they, and not their client who must suffer. We think the fee charged for the services rendered is not only excessive and unconscionable but a ruthless disregard of the rights of the forwarding attorneys. It can make no difference what the actuating cause was for the excessive charge, whether want, greed, or an exaggerated idea of the value of his services, for it all goes to show that respondent's sense of balance and proportion disqualify him for the duties of an attorney. Respondent asks:

"Can it be said that where an attorney who makes a charge as a result of a misunderstanding, or lack of understanding, has by so doing evidenced a moral unfitness which warrants disciplinary action, . . . ? If the conduct of an attorney as a result of an honest misunderstanding warrants such discipline, I bow to the will of this Honorable Court, with reluctance, it is true, and with fear not only for myself alone, but for every member of the bar association of the state. The check is still in California. If this Honorable Court believes I am only entitled to receive $75.00 for my services that check will be delivered. I can do no more. I believe, however, that I have a right to have my fee passed upon by a civil court and not by my competitors just as did the members of the local grievance committee to whom I have referred herein."

This question is a mixture of fact and fiction. If there was anything whatever in the record to indicate that respondent kept such large fee out of the collec-

tion through some misunderstanding, or lack of understanding, or that such misunderstanding, or lack of understanding, was honest, we would not hesitate to answer "No" to this question.

If this was the first time respondent's conduct as an attorney had been a subject of investigation and court review, resignation by him of his fate "to the will of this Honorable Court" would fall on patient and forgiving ears, but this is the third time, since his admission in 1924 to the bar of this state, that he has been charged with unprofessional and unethical conduct. In *In re Myrland,* 43 Ariz. 126, 29 Pac. (2d) 483, decided February 19, 1934, was involved respondent's conduct in deducting his whole fee from the first partial payment of a judgment for damages for personal injuries instead of the percentage represented by his fee. His conduct was condemned as unethical but he was let off with a reprimand. In *In re Myrland,* 45 Ariz. 484, 45 Pac. (2d) 953, decided June 3, 1935, respondent was charged with obtaining property from a keeper thereof by means of a bogus document so drawn by him as to induce a belief by the keeper that it was a court order. For such unprofessional conduct he was suspended for six months. We refer to the court's comment in that case:

" . . . We think it goes without saying that, if an attorney attempts to deceive another during pending litigation by inducing him to believe that a document prepared by the attorney is an order by the court, it constitutes unprofessional conduct in the highest degree. It is a fraud upon the party, and, in effect an abuse of the process of the court as a cloak for extortion. . . .

" . . . This court is of the opinion that, in view of the facts in this case, and of other matters which are within the judicial knowledge of the court, but which we need not set forth in this opinion, this is the mini-

mum penalty which we would be justified in inflicting. . . . "

Warnings and leniency seem to have no effect upon the respondent. We should like, if our judgments did not impel a different conclusion, to permit the respondent to continue in his practice on condition that he return to the forwarding attorneys the sum he suggests he is willing to return, and which it seems would at one time have satisfied such attorneys and the local administrative committee. We feel that he has been given ample opportunity to show that he is fit to practice in the courts of this state; that he has completely failed to measure up to the standard required and expected of the profession, and that therefore the order should be that his name be stricken from the roll of attorneys and that he be disbarred from further practice of the profession of law in Arizona. It is so ordered.

ROSS, C. J., and LOCKWOOD and McALISTER, JJ., concur.