**UNITED STATES of America,**
v.
**Herald E. STRINGER.**
**No. A-9150.**

District Court, Alaska
Third Division.
Oct. 4, 1954.

James Fitzgerald, Asst. U. S. Atty., Juneau, Alaska, William Plummer, U. S. Atty., Clifford Groh, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

Edward V. Davis, Wendell P. Kay, Harold J. Butcher, George B. Grigsby, Anchorage, Alaska, for defendant.

McCARREY, District Judge.

This is a disciplinary action ostensibly instituted against the defendant under subsections 3, 10, and 13 of section 35–2–71, A.C.L.A.1949, and 35–2–21, A.C.L.A.1949. The information against defendant was filed by the former U. S. Attorney on September 24, 1953, and grew out of the dealings between defendant and his then client, Robert L. Kemp. These dealings are alleged to have commenced on or about May 7, 1952, and to have continued through June 18, 1952.

The information alleges that on May 7, 1952, defendant accepted a hundred dollar retainer fee to defend Kemp on a criminal charge; that on May 9, 1952, defendant obtained an oral agreement by which Kemp was to pay an additional $450, the defendant then knowing that the case would probably be dismissed; that defendant later advised Kemp that an additional $2,000 would be necessary to keep the case out of court; that on June 10, 1952, defendant conferred with the U. S. Attorney and learned that the case would be dismissed; that he failed to so advise Kemp, and, on June 17, 1953, secured two promissory notes for the fee; that, when Kemp refused to pay, defendant threatened him with suit and that he would resurrect the criminal case if Kemp refused to pay.

The answer filed by defendant admits the payment of the $100 on May 7, 1952, but for the service of preparing a bond and securing Kemp's release only; the oral agreement with Kemp on or about May 8, 1952, for $2,500 for whatever defense might be necessary; and a subsequent agreement to forgive $1,000 of the fee. It alleges that, when the agreement for the $2,500 fee was made, defendant fully discussed the merits of the case with Kemp; that, only after considerable discussion with

the U. S. Attorney did the latter become convinced that the case should be dismissed; and that defendant was not informed of the dismissal until June 16, 1952, when he immediately informed his client. At this point, it is alleged, defendant requested payment of the balance of the fee and was informed by Kemp that he could not pay so that the parties agreed to have promissory notes for the amount executed.

The grounds for the action as set forth in the pleadings are:

1. The defendant, in violation of the trust and confidence of his client, knowingly failed to advise his client concerning the status, merits and probable outcome of his client's case. In so doing the defendant was motivated by a desire for personal gain in the form of fees.

2. The $2,550 fee which defendant charged his client was grossly excessive in that it bore no proper relation to the amount of work done by the defendant, the benefits obtained for the client, or the client's ability to pay.

3. In securing R. L. Kemp's agreement to pay a fee of $2,550 the defendant was guilty of unconscionably overreaching his client. In obtaining said agreement the defendant knowingly secured an undue advantage by reason of his client's fear and ignorance of the law and the defendant's own lack of candor in dealing with his client.

4. By his conduct the defendant tended to bring the legal profession as a whole into disrepute and to undermine the public confidence in the administration of criminal justice in the Territory of Alaska.

On the 13th of February, 1953, defendant made a motion for an order referring the matter to at least three disinterested members of the Bar, pursuant to Sections 35–2–72 through 35–2–77 and Section 55–7–102, A.C.L.A. 1949. After hearing on said motion, the order was denied for the reasons set forth in the Memorandum Opinion signed on March 4, 1954. At the hearing on said motion, this Court offered to disqualify himself from hearing the case but was urged not to do so by counsel for the defendant and the U. S. Attorney's Office.

On June 17, 1954, trial of this case commenced. The proceedings began with a hearing on defendant's motion to dismiss, which was filed with his answer, and a motion for summary judgment filed June 15, 1954, together with numerous affidavits. The motion to dismiss was not argued, nor was any ruling then made on said motion. It is now hereby denied. The U. S. Attorney's Office consented to the motion for summary judgment. They did this on the basis of the testimony then at their disposal and with the apparent agreement of the former members of the U. S. Attorney's Office who had instituted the suit.

The Court, however, felt that, at that point, a summary judgment was not warranted, and the case proceeded to a trial on the merits. The motion for summary judgment was renewed at the close of the trial and was thereupon denied.

### Statement of Facts

On the trial of the case it was developed that one Robert E. Kemp, who had lived in the Anchorage Area since 1950, was employed by the Radio Cab Company; that, while in the employ of the Radio Cab Company as driver of taxi-cab number 77, in the late evening of May 5 or the early hours of May 6, 1952, he was dispatched by his employer and one James Lewis to proceed to Joe's Lower Level and pick up a fare; that upon arriving there he picked up a woman whom he did not know and was instructed by her to go to the Alley Cat Bar, on C Street between 4th and 5th Avenues, in the City of Anchorage; that, after reaching that bar, she directed him to stop and pick up three soldiers, which he did, and then ordered him to drive out towards Mt. View. As he turned east on Fifth Avenue at the corner of "C" Street he saw the woman slump down in the seat, at which time he ordered her to sit up in the car

Concurrently therewith a City Police officer of the City of Anchorage pulled him over to the side of the curb and Kemp was thereafter taken, along with his fares, to the City Police for an investigation.

After investigation, he was jailed for transporting passengers for the purpose of prostitution on a complaint filed by Sgt. Joe D. Gray, the arresting officer. His bail was set at $2,500.

Since the arrest and subsequent proceedings were conducted in the early hours of the morning, it never was clearly proven exactly when the arraignment took place after the arrest, but it stands unrebutted that the complaint was signed on May 6, 1952.

While arrangements were made for the bond by various individuals, the evidence was conclusive that James Lewis, or someone under his direction in the Radio Cab Company, called the defendant and had him appear in the U. S. Jail with one Pat Rollins, who was also a part owner of, as well as a driver for, the Radio Cab Company. It is undenied that Pat Rollins took $100 with him to the jail at the time the defendant and he went there to post bail for Kemp.

Kemp testified that at the time of their meeting in the jail, defendant agreed to represent him for a total sum (on the entire case) of $500, $100 of which was paid down by Mr. Rollins as a retainer fee. The defendant denies this and states that the $100 was a total fee for obtaining bond and justification thereof for the complaining witness. He testified that it was not until later on that same day, or a day or two thereafter, that the complaining witness came to his office in the company of Mr. Lewis, at which time the fee of $2,500 was agreed upon and another $100 paid by Mr. Lewis for the complaining witness upon the $2,500 fee. Kemp testified that he did not have any money either at the time he was in jail or after he came back to talk with the defendant about employing him as his counsel.

Kemp further testified that he was not acquainted with any attorney and that he went to the office of the Radio Cab Company where James Lewis worked, and asked him what he should do about employing counsel, at which time Mr. Lewis advised him that Mr. Stringer, the defendant, was a good attorney and had successfully represented another employee, who had been charged with a similar crime, at an earlier date. This testimony was corroborated by that of James Lewis. The evidence further revealed that Kemp had never had any prior criminal record nor any previous experience with attorneys other than in the preparation of a conditional sales contract for the sale of an automobile here in the City of Anchorage, in 1951.

Kemp testified that he relied upon Mr. Lewis' recommendation to employ the defendant to represent him and that on the sixth of May, 1952, or a day or two thereafter, in the company of Mr. Lewis, he went to see Mr. Stringer to talk about the case.

Kemp testified that prior to going to see Mr. Stringer he discussed the merits of the case and also the fee with James Lewis. Mr. Lewis advised him that he felt he could get a better "deal" with Mr. Stringer and that he would try to obtain representation for him for from $1,000 to $1,500. This fact Lewis denied on the witness stand. In any event, at the first or second meeting a fee of $2,500 was set by the defendant, the understanding of Kemp being that the $500 fee agreed upon at the time the defendant saw him with Mr. Rollins in jail was a total fee in the event the defendant had to go to trial on the case, and $2,000 the fee if the defendant succeeded in having the case dismissed and settled out of court.

The defendant denies this and states that the total fee was $2,500 whether the case went to trial or whether it was settled out of court.

There is some conflict on the testimony as to whether the merits of the case were discussed in detail by defend-

ant and Kemp in the presence of Pat Rollins at the time defendant went to see Kemp in jail. Both Kemp and Rollins state that there was considerable discussion of the merits of the case at that time, and that the total fee was then agreed upon, that agreement being for the sum of $500. However, there is no question as to the fact that the merits were gone into fully at the first meeting of Kemp and Lewis at the defendant's office. Kemp, defendant, and all of his witnesses state that Kemp was then advised of the seriousness of the crime with which he was charged; of the fact that since he was a taxi-cab driver and since at that time there was a drive on in the city of Anchorage to apprehend as many taxi-cab drivers as possible for infractions of the law, particularly in white slave cases, the situation was more serious for him; that there was a very good chance that the grand jury would indict him; and that he would have to go to trial and would have to serve time if convicted. At the same time the defendant was informed of the manner in which the complaining witness was dispatched by Lewis to go to Joe's Lower Level and pick up the fare in the ordinary course of business, and that there was a dispatch sheet available to confirm this fact.

There was conflict in the testimony concerning whether or not, (at their first meeting in the defendant's office, when the attorney fee of $2,500 was discussed), it was understood that part of the agreement was that defendant would try to get Kemp's chauffeur's license back. Kemp testified that the driver's license was extremely important to him since he did not have any money and that driving cab was the only way he had at that time of earning his livelihood. He testified that he informed defendant in order to earn money to pay the fee, he would have to have his chauffeur's license back.

After the first two or three meetings between Kemp, Mr. Lewis, and the defendant, at the latter's office, Kemp felt that the fee was too high and went to another attorney named Peterson to discuss the merits of the case and the fee set by Mr. Stringer. The record discloses that Mr. Lewis also went with him and that Pat Rollins coincidentally was at Mr. Peterson's office, on company business, at the time Mr. Lewis and Kemp arrived. It so happened that the same Mr. Peterson represented the cab company, and Mr. Rollins had suggested that they go see another attorney because of the size of the fee set by the defendant.

The evidence discloses that Mr. Peterson said the fee was too high and advised Kemp he would handle his case for $250 but told Kemp he would first have to discharge his contract with the defendant. Kemp testified that Lewis prevailed upon him not to change attorneys but to remain with Mr. Stringer, since Mr. Stringer was politically powerful and could best handle the case. Lewis further urged him not to go to trial on the case but urged him to have it settled out of court. So apparently against the complaining witness's better judgment, he returned to the defendant and continued his professional relationship with him.

The record will disclose that Kemp went to see the defendant "several times", most of the time in the company of James Lewis, and the defendant and Mr. Lewis testified that Mr. Lewis went to see the defendant several times by himself.

Prior to the time that the case was dismissed, which was on the 18th of June, 1952, (although defendant's Exhibit F reveals that in a note on the folder of the case put in by Mr. Buckalew, case was dismissed for lack of evidence on the 10th day of June, 1952), Kemp testified that since he did not have the money to pay the fee at the time, the defendant proposed that he sign a promissory note for the balance of the fee. The defendant and his witnesses testified that on the 17th day of June, 1952, after defendant had been advised that the case would be dismissed by Mr.

Buckalew, the District Attorney, he called Mr. Lewis and had Mr. Lewis contact Kemp and ask him to come to his office. He then told him of the "good" news" of dismissal, and stated that he wanted the balance of his money. Since Kemp apprised defendant that he did not have any money, defendant agreed to take a promissory note for $2,000. Defendant claimed that this sum of $2,000 was then due and owing although there was no testimony that there had been more than $200 paid at that time on the alleged $2,500 attorney fee, $100 by Pat Rollins for Kemp and $100 by James Lewis for Kemp, supra. The $300 difference between that which was paid down and the promissory note which he wished to extract from Kemp was never explained. Approximately a year later, however, other sums were paid. The record discloses that the Court directed defendant to produce his books concerning the fee in this case, but defendant failed to do so.

The defendant then insisted that promissory notes be signed and that he wanted a co-signer. Kemp advised the defendant he could not get a co-signer on a $2,000 note; therefore, the $2,000 note was broken down into two $1,000 notes; and, in the company of Mr. Lewis, Kemp went to one Mr. Lloyd Arthur Smith of the Alaska Sales and Service to have him co-sign the note. Smith refused to do so until after he had talked it over with his wife, who would be home after work that evening. Again in the company of Mr. Lewis, Kemp went to see Mr. and Mrs. Smith, and, after considerable pressure was. brought to bear upon them by Mr. Lewis, Mr. and Mrs. Smith signed one promissory note for $1,000 and the same was taken back to the defendant. Thereafter, on the following day, namely, June 18, 1952, a letter from the District Attorney's office discloses that the the case was dismissed by the District Attorney on the grounds of "insufficient evidence to warrant prosecution".

Kemp failed to make the payments upon the promissory note. He also went back to the defendant at least one time in an effort to obtain his chauffeur's license but was unable to do so. The evidence discloses that there was little, if any, contact between the defendant and Kemp after the case was dismissed until the summer of 1953, at which time the defendant tried to collect the balance of his attorney fee. Exhibit 3 of the plaintiff, which is comprised of four receipts from the defendant for payments received upon the promissory note, shows that between the 29th day of July and the 27th day of August, $215 was paid by Kemp toward the fee. Since Kemp apparently refused to pay any more upon the promissory notes, the defendant phoned Mrs. Smith on one or two occasions, when he advised her that she and Mr. Smith would have to pay the note they co-signed, unless payments were made by Kemp. While not crystal clear, the evidence will reveal that the defendant agreed to cancel the one-thousand-dollar note which was not co-signed. Kemp then sought other counsel in an effort to preclude further payments, which was the beginning of a chain of reaction that caused the filing of this information against the defendant.

Mr. Buckalew, the District Attorney, testified that he never considered the case against Kemp as serious for the reason that there had not been an F.B.I. investigation of the case. He testified that he had some 200 cases on his desk at that time. He also testified: " * * * When I think of white slavery cases, I I usually think of transportation from Seattle to Anchorage, or from Anchorage to Seward." Therefore he did not consider the case very grave. Mr. Buckalew further testified: "Question: Can you tell the court the circumstances surrounding the dismissal of the case U. S. v. Kemp? Answer: Judge, I can't remember too much about it. I am—my recollection of the case is almost nil. The only thing that I can recall is that I think Mr. Stringer brought that dispatch sheet and informed me that Mr. Kemp had been dispatched in the regular

course of his business, that Mr. Lewis had called him and directed him to go to a certain fare, but I said if he was dispatched and those are the facts, I will dismiss it."

Another time Mr. Buckalew was asked the following question: "Now, Mr. Buckalew, were you otherwise diligent in handling this case? Answer: Yes, I looked into the facts, and felt that it was without merit."

At another point Mr. Buckalew was asked, "Question: Do you recall that the thing that convinced you that you didn't have a case in the case—do you recall what it was that convinced you? Answer: To be honest with you, Mr. Kay (who was one of the attorneys for the defendant), I don't think that I ever intended to prosecute U. S. v. Kemp, but the thing that definitely threw it out was the fact that the dispatch sheet was brought to my office, and my best recollection is that Mr. Stringer procured the dispatch sheet, and I don't know whether he ever showed it to me or not, but if he told me that there was a dispatch sheet, and it showed this particular trip, why, I probably took his word for it. I don't know whether he showed it to me or not. Question: That would have destroyed the intent necessary for conviction under the Mann Act [18 U.S.C.A. § 2421 et seq.] am I right? Answer: That would have made the case absolutely worthless."

Concerning the work involved by the defendant in the case, Mr. Buckalew testified, "Question: Now, how many times did you talk to Mr. Stringer prior to the time the case was dismissed about it? Answer: I don't have any—I can recall talking to him at one time and I'm not sure about that, but I am——"

"The Court: Now, you testified, I believe, that you were confused about this case with one of Mr. Connolly's (Mr. Connolly was a partner of Mr. Stringer). Do you know whether Mr. Connolly had a white slave case at that time?

"Mr. Buckalew: Mr. Connolly informed me * * *

"The Court: Well, I want to know what you knew at that time.

"Mr. Buckalew: I have a vague recollection that some three weeks before that I had a case involving the same company and one of their cab drivers, and they had the wrong cab driver, and Mr. Connolly informed me that he saw me the one time, and * * *

"The Court: Now, one time on this case?

"Mr. Buckalew: On this case.

"The Court: Do you know how many times he may have seen you on this case?

"Mr. Buckalew: I don't think Mr. Connolly ever saw me on this case.

\* \* \* \* \* \*

"Q. (Fitzgerald): Now, how many times did you talk to Mr. Stringer prior to the time the case was dismissed, about it? A. (Buckalew): I don't have any— I can recall talking to him at one time and I am not sure about that, but I mean * * *

"Q. About Kemp, the Kemp case? A. About the Kemp case.

"Q. You can recall one time, but you are not sure about it? A. But, I am not sure about that and I should say that in all fairness to Mr. Stringer, that for two weeks I had the case confused with a case that Mr. Connolly had and I can only recall talking to him at one time."

There is evidence that defendant acted as attorney for the Radio Cab Company in another white slave case. This evidence consists of the testimony of James Lewis, who testified that the Radio Cab Company had a "similar case" which was handled by the defendant, and while he was not certain of the fee charged in that case he testified that he did remember the figure of $300, although he did not know whether that was a retainer or the total fee.

Although the witness Kemp was impeached in certain respects, his testimony was not completely deprived of value. Especially is this true when the court must consider the evidence which is in the power of one side to produce and of

the other to contradict. For example, the defendant was in a position to explain to the court the attorney-client relationship between himself and one Glen or Green Hadaway, who was the other cab driver whom defendant represented in a similar case, according to the testimony of Lewis. That case was likewise dismissed. Moreover, the defendant failed to produce any briefs or notes which he may have prepared or taken in the preparation of this case. Such briefs or notes would tend to show the amount of work the defendant or his partner had put into the preparation for or to secure the dismissal of the Kemp case. The only inference which the court can draw from the failure of the defendant to explain or produce evidence in this respect is that such evidence would have been adverse to defendant.

The court was also concerned over the lack of inconsistencies between the defendant and his witnesses, since in most cases under like circumstances there are differences in testimony. This absence of inconsistencies and lack of spontaneity persuade me that the defense witnesses were exceedingly well rehearsed at pretrial discussions and precludes me from giving their testimony too much weight.

The defendant paraded a number of able attorneys of the Bar before the Court, who testified that a fee of $2,500 for a white slave case was not excessive. (In fact, one counsel testified that such a fee was not enough. However, on cross examination, it was brought out that this counsel had never handled a white slave case, and it could be presumed that his fee charge was one of the reasons why he had not.) Concerning expert opinion on this matter, it was interesting to note that with but one or two exceptions, these experts, when cross examined and asked to apply facts of the U. S. v. Kemp case to the fee charged, admitted that a fee of $2,500 was too high. It was also noteworthy that while several had set a fee of $2,500 or in excess, few if any had been able to collect such fees. In one instance, a charge of $2,000 had been made, by two of the experts (although one insisted that it was $4,000, and that they were each to get $2,000), but the client went elsewhere for counsel.

By stipulation of counsel for the government and the defendant other affidavits were admitted concerning the fee, so that the court did not have the benefit of cross examination.

The defendant introduced Exhibit D, which is a portion of Canon 12 of the Code of Professional Ethics, titled "Fixing the Amount of the Fee". Subdivision (1) of Canon 12 concerns itself in part with the subject of the time and labor required as a factor in fee setting. There is no dispute in the record but that James Lewis was by Defendant's office frequently and that Kemp was by the defendant's office several times (most of the time in the company of Lewis) between the 7th of May and the 18th of June, 1952. While Mr. Connolly testified that considerable research was done in the preparation of the case, there is nothing else in the record to prove this, although both he and the defendant were asked to produce any brief or notes which they had that would indicate this amount of work. Thus the court can only conclude that the work concerning the case consisted almost exclusively of office calls by Kemp and Mr. Lewis, with at least one visit by the defendant to the district attorney's office (supra). Assuming that the defendant concerned himself every day from the 6th of May through the 18th of June with the case, the latter day being the day on which the case was dismissed, the $2,500 fee would have paid him approximately $58.14 a day. Excluding therefrom eight days for Saturdays and Sundays, the defendant would have been paid approximately $71.42 per day. And, assuming further that the client came by twice a day, he would be paid approximately $35.71 for each call for the number of work days that the defendant's office was open during that period of time. But since the records stand without contradiction that the client was only by several times, and Mr. James Lewis somewhat more than

that, the fact of the exorbitancy of the fee is patent. Subdivision (2) of Canon 12, referring to fixing the amount of the fee, reads as follows:

"Whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients".

Throughout the trial the defendant and some of his witnesses emphasized the heinous nature of the crime with which his client had been charged. The defendant and Mr. Connolly particularly stressed the amount of consideration that they gave to the reputation of Kemp in setting the fee, and referred to the loss of business that they felt they would sustain by accepting such type of employment. In fact, one of the defense counsel used the word "pimp" loosely in such a manner as to attempt to prejudice the court. Yet the defense never produced any evidence of conviction, nor did they present any witness in proof of this fact, which leads the court to conclude that neither the defendant nor his partner had to take any back streets going to and from work by reason of representing Kemp. Thus, in applying the tests of Canon 12 of the Code of Professional Ethics to this case and giving all of the facts an interpretation most favorable to the defense, I am of the opinion that the defendant merely saluted this pillar stone of direction and guidance when the fee was set.

Concerning the elements to be considered in setting a fee, the defense endeavored to establish that while the merits of a case and the actual amount of time and labor required in the preparation and trial thereof were to be considered, they were not too important. The court thereby was left with the inference that other elements were regarded by them as more significant.

## Conclusions

Although the evidence is somewhat in conflict, in viewing the case in its entirety, I am left with the firm impression and conviction that the government has sustained the burden of proof. I find that the government has proved the following charges which are set forth in Paragraph 7 of the information:

"1. The defendant, in violation of the trust and confidence of his client, knowingly failed to advise his client concerning the status, merits and probable outcome of his client's case. In so doing the defendant was motivated by a desire for personal gain in the form of fees.

"2. The $2,550 fee which defendant charged his client was grossly excessive in that it bore no proper relation to the amount of work done by the defendant, the benefits obtained for the client, or the client's ability to pay.

"3. In securing R. L. Kemp's agreement to pay a fee of $2,550, the defendant was guilty of unconscionably overreaching his client. In obtaining said agreement the defendant knowingly secured an undue advantage by reason of his client's fear and ignorance of the law and the defendant's own lack of candor in dealing with his client.

"4. By his conduct the defendant tended to bring the legal profession as a whole into disrepute and to undermine the public confidence in the administration of criminal justice in the Territory of Alaska."

I find that the government has failed to prove any bribery of law enforcement officials or "fixing" by the defendant, although I find that Kemp was led to believe that one fee would be charged to settle the case out of court whereas another would be exacted if the case went to trial, thereby implying at least, that it would take a greater amount to keep it out of court and from the public than to try the case in court. I find that one James Lewis, who was part owner of the Radio Cab Company for whom Kemp worked, and who was the dispatcher of the company at the time the original incident occurred, acted for

the defendant in his dealings with Kemp. I find that he was, in fact, the individual who advised Kemp to seek the counsel of the defendant, and that he continued to act in the capacity of defendant's representative until the promissory notes were signed by Kemp.

■ Be the expert testimony what it may, I am of the opinion that the court is not absolutely bound by testimony of the attorneys who testified regarding the reasonableness of the fee. In re Information to Discipline Certain Attorneys of the Sanitary District of Chicago, 351 Ill. 206, 184 N.E. 332; St. Louis-San Francisco Railway Co. v. Hurst, 198 Ark. 546, 129 S.W.2d 970, 122 A.L.R. 965.

To become an attorney, I am aware that schooling is expensive and office expenses are costly; however, I am also convinced that the court must come to the aid of the public when certain individuals of the profession do not predicate the charge for their services upon the merits of the case but upon the ability or possibility of extraction of the fee, regardless of the merits of litigation, and the amount of effort and time and experience, they put into the preparation and disposition of a case.

Such inordinate fees as were charged in this case cannot be professedly exacted for legal services without creating the impression in the mind of the client that such fees are for "fixing", with all its connotation of graft, bribery, and corruption. I therefore find that the fee set in this case was excessive.

■ While it is difficult to enumerate in order of their importance the elements to be considered in setting a fee by an attorney with his client, I am of the opinion that the merits of the case, the time and labor required, the novelty and difficulty of the question involved, and the skill requisite properly to conduct the case, most of which are set forth in Subdivision (1) of Canon 12, supra, are extremely important.

■ Although there are a few authorities to the contrary, an excessive fee is generally regarded as insufficient to warrant disciplinary action unless there are other factors coupled with the excessive fee. 7 C.J.S., Attorney and Client, § 23b, p. 745; Ex parte Goodman, 377 Ill. 578, 37 N.E.2d 345; In re J. A. Magoon, 15 Hawaii 244; Herrscher v. State Bar of California, 4 Cal.2d 399, 49 P.2d 832; In re Myrland, 54 Ariz. 284, 95 P.2d 56, 57; In re Smith, 42 Wash.2d 188, 254 P.2d 464; In re Wiltse, 109 Wash. 261, 186 P. 848; an annotation in 80 A.L.R. 706.

But I find that coupled with this excessive fee there are other factors which the court must consider in this case, and which coupled with the excessive fee warrant disciplinary action in this case.

(a) I find that there was a contract entered into by the defendant and Kemp for the latter's full representation for the sum of $500, and that this contract was formed when the defendant went to the jail and discussed the case with him and Pat Rollins. Defendant was then paid $100 of that $500 fee.

(b) I further find that there was a second fee set by the defendant in the sum of $2,500 in the defendant's office, the exact time being in dispute, which was in violation of the fiduciary relationship which existed between the defendant and Kemp by reason of the prior contract.

■ While the law is clear that the attorney is in the same position as any other person negotiating a contract for employment initially, at which time he is dealing at "arm's length", and the relationship is not then subject to the particular scrutiny of the court, 7 C.J.S., Attorney and Client, § 181a, p. 1047, once the relationship of attorney-client has been entered into, as I find in this case it had been (supra), the attorney stands in a fiduciary relationship to the client and any alteration of that contract will be scrutinized very closely by the court in order to determine whether or not there has been a breach of the fiduciary relationship. 7 C.J.S., Attorney and Client, § 127a, p. 964.

■ Moreover, where the relationship is already established, in setting a fee

the attorney has the burden of proof of fairness and good faith. In re Burns, 55 Idaho 190, 40 P.2d 105; In re Doss, 367 Ill. 570, 12 N.E.2d 659. I feel that the defendant has failed to sustain that burden.

I further find that there was overreaching by the defendant in this case. I find that the defendant took advantage of Robert Kemp's fear, ignorance, and lack of experience in the attorney-client relationship. The record is clear that Kemp did not have a criminal record, nor had he had any previous experience with attorneys or litigation other than the drawing of a conditional sales contract for the sale of his car here in Anchorage in July of 1951, and one other like contract in the States. All witnesses to this fact, including the defendant himself, testified that Kemp was advised of the seriousness of the crime with which he was charged; that they referred to his possible indictment by the grand jury; that he was told of the penalties which might be imposed, including the possibility of his being imprisoned; that he was repeatedly reminded of his precarious position in the matter since he was a cabdriver and cabdrivers were being closely watched at that time; that because he was a cabdriver his chances of beating the case were slim; and that there was a strong probability that the case would have to go to trial. Such advice served to intimidate him and compel him, in his ignorance and inexperience, to accept whatever terms his attorney sought to impose upon him.

Since it is my conclusion that the attorney-client relationship was established when the defendant called on Kemp in jail, the fact that the defendant denied the contract entered into for the sum of $500 at that time I consider unimportant, insofar as defendant's culpability is concerned. Whether this prior agreement for $500 was made or not, it is no less culpable for an attorney to take advantage of his client's necessities and inexperience to induce him to make a contract in advance to pay an exorbitant fee for services than it is to take advantage of those necessities and inexperience to exact an unreasonable fee after the services have been rendered. Defendant's forgiveness of $1,000 of the fee does not lessen the impropriety of his conduct. Rather, it illustrates that Defendant himself felt the fee to be excessive.

This action of discipline is not designed to compel payments by the client to the attorney, but is to protect and preserve the honor and integrity of the legal profession. The fee was not commensurate with the true value of the services rendered. By setting such a fee, Defendant was attempting to exact a consideration to which, in good conscience, he was not entitled.

When an attorney enters upon the practice of law, he thereby assumes certain duties and obligations and is required to conform to certain standards. Members of all professions have lodestars to lead the way in the cardinal principles and precepts of the ethics of their particular profession. The general public seeks the advice, counsel and guidance of the professional man in helping them to solve their particular problems with their fellow men. In People ex rel. Chicago Bar Association v. Green, 353 Ill. 638, 187 N.E. 811, 813, the court said, "A lawyer is an officer of the court—a minister in the temple of justice. His high calling demands of him fidelity to his clients with an eye single to their best interests, as well as good faith and honorable dealings with the courts and the public in general."

It logically must then follow that when an attorney no longer conforms to these standards and principles upon which the legal profession is founded, the court and the public become interested parties and rightly so, for under Canon 11 of the Canons of Judicial Ethics of the American Bar Association, the court is charged:

"A judge should utilize his opportunities to criticize and correct unprofessional conduct of attorneys and counsellors, brought to his attention; and, if

adverse comment is not a sufficient corrective, should send the matter at once to the proper investigating and disciplinary authorities."

When applying the tests used in the Green case and the standards established by the Code of Professional Ethics to the facts of this case, I am of the opinion that the defendant has not shown that he possesses the sense of duty to his profession that the court and the public are entitled to expect of him.

The court is presented with a weighty problem in determining the extent of the discipline which the facts of this case warrant. The gravity of this responsibility is deeply felt by the court because of the long acquaintance which this court has had with the defendant. Nevertheless, the court's duty must transcend all personal emotion and human desires, and it must discharge its moral obligation based upon the law as applied to the facts in this case. Therefore, because of the firm conviction which I have concerning the merits of the charge, I have no alternative but to order the suspension of the defendant from the practice of law for 120 days from the entry of an order in accordance with this opinion.