# IN THE MATTER OF CHARLES QUINN, AN ATTORNEY AND COUNSELLOR AT LAW.

Argued September 30, 1957—Decided November 12, 1957.

*Mr. Joseph Fishberg* argued in support of the order to show cause.

*Mr. Leon Kapp* argued for respondent in opposition to the order to show cause (*Kapp Brothers,* attorneys; *Mr. Herman W. Kapp,* on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is a disciplinary matter arising out of a complaint made by respondent's client, Sawa Zaboronak. It is charged that (1) respondent, despite an agreement to accept a fee of $1,000, demanded and received the further sum of $4,000 by threats, and (2) the amount received was "unreasonable and grossly excessive."

On December 20, 1951 Zaboronak conveyed premises known as 14 Cornell Avenue, Hamilton Township, to his son and daughter-in-law, on the strength, as Zaboronak claimed, of an oral promise that he could live there with them for the rest of his days. He made the conveyance despite advice against it by another attorney of his own selection. After some months, friction developed between Zaboronak and his daughter-in-law, as the result of which he was excluded from the home. On October 2, 1952 Zaboronak retained respondent to recover the property.

Zaboronak testified respondent agreed to handle the case for a flat fee of $1,000. Respondent however insisted he was to receive $1,000 against a contingent fee of one-third of the value of the property.

After respondent wrote to the son and daughter-in-law, conferences ensued between Albert Cooper, Jr., their attorney, and respondent. It quickly developed that the son conceded the oral agreement his father claimed, but despite the father's insistence that the home represented his own investment, the son had in fact paid numerous bills, which he said totalled about $7,000. The son was preparing to leave for Kentucky to be employed there and we gather respondent correctly sensed the son would accept reimbursement on that basis, notwithstanding that he asserted he should be deemed to be an equal owner with his father. Respondent proposed that for the purpose of negotiations he suggest the property was worth $14,000, and that either buy out the other for $7,000. As respondent anticipated, the son accepted $7,000. It developed that some vacant lots (or perhaps a one-half interest therein) had also been conveyed to the son, who agreed to return them in exchange for a promise that he could occupy the home until April 1953 when he expected to depart for Kentucky. The matter was closed on that basis on January 26, 1953. A mortgage of $7,000 was placed with John Ewanicz, a friend of Zaboronak and client of respondent, who had initially recommended respondent to Zaboronak to handle this matter.

According to respondent, Zaboronak pleaded his inability to pay the balance of the fee, but said he held a mortgage of $6,000 on other property which would fall due at the end of the year and he would then complete the payment. Respondent testified they agreed upon a charge of $5,000 (less the $1,000 already received) which was also to include his services in some other minor matters which he in the meantime handled for Zaboronak. About December 29, 1953 Zaboronak collected the $6,000 and paid it to Ewanicz in reduction of the $7,000 mortgage. Ewanicz met respondent on the day of payment and told him of it, whereupon respondent at once sent Zaboronak a statement for the balance and in a conversation which followed chided him for his failure to keep his word. Zaboronak then agreed that Ewanicz pay $4,000 to respondent, and increase the outstanding mortgage

accordingly. This was done, voluntarily according to respondent, and under a threat to sue and sell the property according to Zaboronak. Ewanicz said he heard respondent threaten to sue and no more. Some months later (the time interval is of no real significance because of Zaboronak's intervening illness), Zaboronak complained to an attorney and ultimately to a member of the Ethics and Grievance Committee, and these proceedings followed.

After initial argument before us, we returned the matter to the Committee for further testimony, including evidence of the value of the property as of January 26, 1953. The experts differed greatly, those selected by the Committee valuing the property at $17,750 and $18,916.40, and respondent's witnesses finding a value in excess of $33,000. Prior to the additional hearings before the Committee, respondent returned $4,000 to Zaboronak with a statement that "I cannot somehow divorce from my mind the feeling that I am under a severe handicap by reason of the complainant's age (now 72) and that any doubts which may arise from the testimony in this case will be resolved against me." The reason may not be flattering to the Committee or to us, but the payment was made without prejudice and we should and do accept it as such.

We suggested that evidence of actual value of the property be obtained in the hope it might shed some further light, but although it is helpful, it is not of decisive influence. The crux of the matter, as we see it, is what respondent and Zaboronak understood to be the value of the property when the fee agreement was made. Respondent testified that when he was engaged Zaboronak told him he had over $30,000 in the property and placed its value between $30,000 and $40,000. Zaboronak did not contradict this testimony. Ewanicz testified that at that point Zaboronak had told him he had $36,000 in the property and later in seeking a mortgage valued it at $65,000. Again Zaboronak did not contradict this testimony. That Zaboronak had a tendency to exaggerate seems evident from testimony he gave on other phases. For example, even in these proceedings he testified

his son did not have "thirty cents in the property, that is all mine," whereas it is clear the son had a substantial investment. Some puffing was not unlikely in view of the intense wrong he felt his son had perpetrated and his desire to activate an interest in the attorney he wanted to accept his cause. There is no suggestion that respondent had any information at that time as to the value of the property beyond the information he received from his client.

■ It is most probable that respondent and Zaboronak did in fact discuss how much was involved. The amount of the fee properly depends in part upon that factor, *Canon* 12, and as lawyers we know that in fixing fees the amount at stake is taken into account. *State v. United States Steel Corp.*, 22 *N. J.* 341, 361 (1956). If indeed Zaboronak told respondent the property had the value stated, an agreed charge of $1,000 would be very low, especially in the light of the inherent difficulties of establishing the oral agreement claimed in connection with a transfer to a son. On the same hypothesis a contingent arrangement such as respondent claims would be a likely one, and in the absence of any testimony whatever by Zaboronak challenging the stated testimony of respondent, we would not be justified in finding that the burden of proof was carried on the charge that respondent departed from an agreement for a flat fee of $1,000.

Other circumstances lend support to this conclusion. This is not a case in which an attorney withheld funds; on the contrary, Zaboronak paid the $4,000 from funds within his own control. He was not without some worldly experience. He had operated a barber shop in Trenton for 45 years, at some stage employing three men, and knew at least four other attorneys and some local public officials. We find it difficult to believe he was stampeded by a threat to sue. It is more probable he knew there was more to be paid, and later questioned the reasonableness of the total charge. Nor can we easily find that an attorney with more than 30 years of experience and an unblemished record demanded an additional fee of $4,000 almost a year after the closing if in

truth he had agreed to a fixed charge which had already been paid.

Thus we come to the second phase, whether the fee charged was such as to warrant discipline.

■ The intangibles which bear upon the fairness of a fee, *Canon* 12; *State v. United States Steel Corp., supra* (22 *N. J.* at *pages* 360–61), defy translation into simple mathematics. At times lawyers differ widely in their appraisals of the value of services, and it is not uncommon for a court to slash requests for allowances. It would be unthinkable to condemn a demand or charge as unethical merely because it exceeds another's judgment of what is fair. The touchstone is moral turpitude. *Cf. In re Frankel,* 20 *N. J.* 588, 596 (1956). It therefore is not enough that a charge is excessive or unreasonable; rather it must be such to a degree which compels a finding that the attorney intended to overreach. *Cf. In re Hahn,* 84 *N. J. Eq.* 523 (*Ch.* 1915).

The test has been expressed in various ways. It has been said that the fee must be "unconscionable," *In re Backes,* 22 *N. J.* 212, 215 (1956); "so exorbitant and wholly disproportionate to the services performed as to shock the conscience," *In re Richards,* 202 *Or.* 262, 274 *P. 2d* 797 (*Sup. Ct.* 1954), and *In re Goldstone,* 214 *Cal.* 490, 6 *P. 2d* 513, 516, 80 *A. L. R.* 701 (*Sup. Ct.* 1931); "so excessive and unconscionable as to indicate that it could not have been charged in good faith," *In re Myrland,* 54 *Ariz.* 284, 95 *P. 2d* 56, 60 (*Sup. Ct.* 1939), and see *In re Cary,* 146 *Minn.* 80, 177 *N. W.* 801, 804, 9 *A. L. R.* 1272 (*Sup. Ct.* 1920). There must be "proof of misconduct accompanied with fraudulent and dishonest motives." *People ex rel. Chicago Bar Ass'n v. Pio,* 308 *Ill.* 128, 139 *N. E.* 45, 47 (*Sup. Ct.* 1923); see, also, *Ex parte Goodman,* 377 *Ill.* 578, 37 *N. E. 2d* 345, 349 (*Sup. Ct.* 1941), and *Herrscher v. State Bar of California,* 4 *Cal. 2d* 399, 49 *P. 2d* 832, 834 (*Sup. Ct.* 1935). The question is "whether it is a *bona fide* dispute over fees or an attempt to convert funds or overreach the client." *Phillips and McCoy, Con-*

*duct of Judges and Lawyers* (1952), *pp.* 111–12. "The amount of the fee which a lawyer deducts from his client's funds presents no ethical question unless it be so flagrantly excessive as to amount to misappropriation." *Opinions of the Committee on Professional Ethics and Grievances of the American Bar Association* (1957), *p.* 108.

▮ We cannot condemn the contingent arrangement itself as unethical. *Canon* 12 provides "the contingency or the certainty of the compensation" may properly be considered. We are not called upon to say whether the contingency would be deemed excessive if the controversy were between the attorney and client. The question here is whether it presents a basis for discipline, and we are satisfied that it does not.

▮ The issue thus becomes whether respondent acted in bad faith when in applying the contingent agreement he concluded the charge should be $5,000.

Respondent did not testify as to what he believed the property was worth, but rather said he took Zaboronak's figure of $30,000 to $40,000, and after deducting the $7,000 paid to the son, fixed his ultimate charge well below a third of the recovery. Upon the hypothesis he used, there would be no basis for criticism in these proceedings.

We are satisfied the property was worth less than $30,000. We are not persuaded that respondent believed the value to be but $14,000, the figure used in the settlement negotiations. Respondent testified Zaboronak protested that the valuation was too low. This was not denied by Zaboronak, and Mr. Cooper testified that both the father and son thought the value to be greater. Respondent's testimony that he guessed correctly that the son would elect to sell and hence suggested a lower figure, seems completely credible.

The Committee's experts valued the property (the vacant lots are a minor factor in the total) at roughly $18,000 to $19,000 whereas respondent's experts reached the sum of $33,000. The Committee's experts are the more persuasive. Yet if the property were worth a. few thousand more than $18,000 to $19,000, the charge of $5,000 would square with the contingent agreement. We cannot attribute to respondent

knowledge of what the experts ultimately revealed to be their opinions. In the absence of proof that he believed the property to be worth less than the critical figure of $22,000, we cannot find the requisite element of bad faith. The situation perhaps is not free from some doubt, but even so the doubt must be resolved in respondent's favor. *In re White*, 24 *N. J.* 521, 524 (1957).

It is unfortunate that respondent did not reduce his understanding with Zaboronak to a signed writing at the time he was engaged and again when the settlement was concluded. We understand the disinclination of some lawyers to deal with their clients in this business-like fashion, but sometimes the alternative is a good deal of unnecessary grief.

 The presentment refers to "threats" in connection with the allegation that respondent demanded and received the $4,000 despite an agreement for a fixed fee of $1,000. It is not clear whether it was intended to charge that the threat used was inherently improper or was such only because there was no basis for a claim. At any rate, an attorney may properly say that if a claim he believes to be *bona fide* is not met, he will resort to legal process and pursue it. In fact, *N. J. S.* 2A:13-6 conditions his right to recover reasonable fees, charges or disbursements upon the prior service of a copy of his bill therefor, thus establishing a legislative policy that there be in effect a threat to sue before an action is brought. We are not satisfied that the "threat" here made went further or was attended by impropriety.

The order to show cause is discharged.

JACOBS, J., concurring in result.

*For discharge*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, and FRANCIS—6.