No. 83,004

In the Matter of PAUL ARABIA, *Respondent.*

(19 P.3d 113)

Opinion filed March 9, 2001.

*Edwin A. Van Petten*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for petitioner.

*David G. Crockett*, of Wichita, argued the cause and was on the brief for respondent.

*Paul Arabia* appeared pro se.

*Per Curiam*: This is an original contested attorney discipline case filed by the office of the Disciplinary Administrator against Paul Arabia of Wichita, Kansas, an attorney licensed to practice law in Kansas. The complaint alleged that Arabia had violated KRPC 1.5 (2000 Kan. Ct. R. Annot. 330) (charging an unreasonable fee); KRPC 1.16(b) (2000 Kan. Ct. R. Annot. 371) (terminating representation) and (d) (failure to protect client when terminating representation); and KRPC 8.4(c) (2000 Kan. Ct. R. Annot. 420) (dishonesty) and(g) (fitness to practice law). The complaint also alleged that Arabia violated his oath of office.

The Disciplinary Administrator recommended to the disciplinary panel that Arabia be suspended from the practice of law for 2 years. At the hearing before the panel, the Deputy Disciplinary Administrator, Ed Van Petten, withdrew count 2 of the complaint (terminating representation). After hearing the evidence, the panel dismissed counts 3 (failure to protect client when terminating representation), 4 (dishonesty), and 5 (fitness). The panel found that Arabia had charged an unreasonable fee in violation of KRPC 1.5. The panel recommends published censure.

The Disciplinary Administrator originated this case when the Disciplinary Administrator's office learned through an interview reported in the Wichita newspaper that Arabia's former client, Angelo Fasciano, complained of being subjected to a number of

abuses within the legal system, including the billing of over $150,000 in legal fees on a case that never made it to trial. After making an investigation, the Disciplinary Administrator filed a formal complaint.

Arabia was licensed to practice law in the state of Kansas in 1966. He has practiced exclusively in the Wichita area. Prior to 1992, he had had 4 years experience litigating an age discrimination claim in federal court. Other than actual litigation experience, he has given advice to business clients concerning many different kinds of employment discrimination. Arabia's practice was primarily civil litigation in state court.

In late 1992, Arabia began representation of Angelo Fasciano and Angelo's Italian Foods, Inc. (Angelo's) in defense of a claim made by a former employee. The employee filed a claim with the Department of Human Resources and then in federal court alleging Kansas Act Against Discrimination and Americans with Disabilities Act (ADA) violations, violations of Title VII of the Civil Rights Act of 1964, and violations of 42 U.S.C. 1981 (1994) and 42 U.S.C. 1981a (1994). The complaint prayed for judgment in excess of $2,500,000. Fasciano, president of Angelo's and manager of the restaurant, retained Arabia to defend the action.

Fasciano and Arabia entered into a fee agreement. Under the fee agreement, Arabia's hours were billed at $150 an hour, and Arabia's senior legal assistants' hours were billed at $90 an hour. (Arabia's legal assistants were independent contractors, not attorneys licensed to practice law in Kansas, and had varying levels of legal education.)

Until December 1993, Fasciano made fee payments, as provided in the fee agreement. At that time, Fasciano made partial payments. When his outstanding balance reached approximately $70,000, Arabia, by letter, informed Fasciano that partial payments were unacceptable. Arabia then explained to Fasciano that Federal Rule 11 allows a party to recover attorney fees from the opposing counsel in frivolous cases. When Fasciano questioned opposing counsel's ability to pay the fees, Arabia answered, "Don't worry, we'll get it. As a matter of fact, [opposing counsel] says he just got

a judgment of 40,000 and if I have to I'll go stand by the door at the courthouse and catch whatever possible, salvage."

To assist Fasciano pay the legal fees, Arabia obtained a bank loan application for Fasciano from a local bank. Due to the ongoing litigation, the bank denied the loan.

Between June 9, 1993, and October 27, 1993, Arabia sent several letters to Fasciano demanding fee payments. Some of the letters demanded $5,000 weekly payments, and in others Arabia threatened to withdraw from the case if the payments were not made. One letter, dated June 9, 1993, stated that Arabia planned to withdraw for nonpayment of legal fees and stated:

"Once the court has permitted me to withdraw, I'll have to hire a lawyer to collect the money you owe us, from you.

"You will also have to hire a lawyer to take over the case, at this point.

"I will be able to hire my lawyer on a contingent fee arrangement, but you won't have that opportunity, and no lawyer will be interested in extending credit to you, knowing that it was your refusal to honor your fee arrangement with us that made it necessary for you to obtain new counsel. You will have to pay your lawyer from ten thousand dollars ($10,000) to twenty-five thousand dollars ($25,000) for reviewing the documents filed in this case, and the documents in your possession, so that lawyer can continue the representation of you on the motion for summary judgment and in others matters.

"I will not furnish any papers to that lawyer, because I am claiming a lawyer's lien on the papers in my possession. Attached is a copy of the lawyer's lien."

After receiving the letter, Fasciano retained Gary Austerman of Klenda, Mitchell, Austerman and Zuercher to defend the discrimination case and represent him in the attorney fee dispute. Before agreeing to take the case, Austerman conducted a review of the fees charged by Arabia. After determining that the fees were not justified, Austerman began representing Fasciano. The fees charged by the Arabia law firm totaled $157,147.81. At the termination of Arabia's representation, Fasciano's outstanding balance owed to Arabia was $29,170.74. Austerman contacted Arabia and notified Arabia that he had been retained by Fasciano. Austerman requested the Angelo's case file. Arabia declined to relinquish the file, claiming his right to an attorney's lien.

After several demands for the file, Arabia prepared a summary of the case and sent it to Austerman. Austerman attempted to ob-

tain the case file in federal court. Later, Austerman and Fasciano determined that it was not cost efficient to continue the litigation for the case file, abandoned that issue, and proceeded in the federal action without the file.

Austerman's review of the case summary provided by Arabia and the billing statement which outlined the various areas of research that Arabia had compiled on the case, revealed several areas of concern regarding Arabia's fees. Austerman determined that Arabia had reviewed 150 cases on Rule 11 at a time in the case when the research was premature and unnecessary. Austerman also questioned whether other issues researched by Arabia were necessary to the resolution of the case.

Austerman consulted with Alan Rupe, a Wichita attorney he regarded highly, regarding the reasonableness of Arabia's fees. Rupe concluded:

> "Given all [the facts], I simply have to say that the total fees and expenses in excess of $150,000.00 is appalling. Given the fact that this was a narrow Americans with Disabilities Act case, clearly not a Title VII case, a case which had no experts, a case that should have been assessed as a summary judgment case from the very beginning, I am of the opinion that a $45,000.00 to $50,000.00 [fee] is reasonable."

Based on Rupe's opinion, Austerman filed a motion on behalf of Fasciano requesting that United States Magistrate Judge John Thomas Reid determine reasonable attorney fees for Arabia's representation.

A substantial percentage of the Fasciano's litigation costs involved legal research. The ADA claim consumed about one half of the total attorney fees. Although the remaining state law claims were dealt with summarily, billable hours for dealing with those claims amounted to approximately $75,000.

Arabia testified at the panel hearing that he tracked his own billable hours by use of a tape index where, after dictating a pleading or other documentation regarding the case, he noted the amount of time spent on the work. Arabia's senior legal assistant tracked his hours on a computer where he recorded the date and time and a description of the work performed. Other legal assistants kept track of their time by hand, and, at the end of the billing period, dictated the information onto a tape. The dictation in-

cluded services performed and the time spent on the project. Arabia was unaware of how one legal assistant tracked her time on projects. After the billing staff formulated the client bills, Arabia and his research assistants reviewed and adjusted the billed amounts before sending them out to the clients.

The Disciplinary Administrator asked Arabia to justify the amount of time spent on Rule 11 research at a time when it was not clear that a Rule 11 motion would be appropriate. Arabia explained that when the research revealed that several of the state law claims could not survive a motion for summary judgment, he suggested to Fasciano that he might be able to shift some of the fees to opposing counsel. Arabia stated that Fasciano was adamant that he (Arabia) pursue the possibility. Therefore, when Arabia became confident of the success of the summary judgment motion on the state law claims, he felt justified in spending hours on Rule 11 research.

The Disciplinary Administrator noted that $150 hourly fees generally indicate that an attorney has a high degree of experience in the area of law where the fee is charged. Because Arabia admitted to limited experience in federal discrimination cases and no experience in ADA cases, the Disciplinary Administrator asked Arabia to explain the high fee rate. Arabia reminded the panel that he had defended "many, many other lawsuits." Arabia posited that the cost of defending the claims against Angelo's was largely the result of opposing counsel's incompetent litigation strategy.

Arabia explained to the panel the steps he took to protect his client when he withdrew from the case. Arabia stated that he timed the withdrawal when little was happening on the case, and he had prepared and sent new counsel a litigation summary which cataloged each matter pending in the litigation. Arabia explained that at the time he withdrew from the case, all the procedural maneuvering was finished, and the only thing that was left was the decision on the motion for summary judgment. Shortly after Arabia withdrew, the United States Magistrate Judge granted Angelo's summary judgment.

Arabia testified to the panel concerning his supervision of legal assistants. Arabia stated that he had worked with his senior legal

assistant, John Stark, for approximately 10 years prior to the work on the Angelo's case. He knew Stark's legal research capabilities. The two had developed a system where if Stark was going to be writing a paper, Stark showed Arabia the cases and Arabia approved or disapproved of the cases. Stark sometimes wrote the paper first and then presented the papers and the cases for Arabia's approval. Arabia always exercised final authority in the case.

Regarding the manner of allocating work among the legal assistants, Arabia stated that the less difficult questions were assigned to the less experienced assistants and the more difficult questions to the more experienced assistants.

Terry Mann of the law firm of Martin, Pringle, Oliver, Wallace and Schwartz was called as an expert witness by the Disciplinary Administrator. Mann graduated from Washburn Law School in 1986. Her law practice is almost exclusively employment discrimination litigation, primarily defense work.

Mann testified to the panel that she had defended several employment discrimination cases where the opposing counsel was the same attorney opposing the Angelo's case. Regarding her experiences with the opposing counsel, she stated:

"[Opposing counsel] does have some peculiarities. And I impose, after a painful experience, certain . . . procedures. For example, most of the time in Wichita, if you have a telephone conversation with a lawyer you don't have to write a letter confirming it right away but I do that with [opposing counsel]. And [opposing counsel] routinely denies having received documents that were delivered to him so I make him sign a receipt for everything I send to him. And I never mail anything, it gets hand delivered and faxed and that sort of thing.

. . . .

"I think [opposing counsel] is more inclined to throw in a lot of junk claims, claims that are not supported by fact or law. He routinely puts in tort of outrage claims and conspiracy claims and a variety of other claims, most of which are eliminated through summary judgment."

Although Mann acknowledged that defending a case against the opposing counsel in the Angelo's case was a challenge, she also stated that none of the cases she had defended against this opposing counsel resulted in a fee as large as that charged by Arabia in the Angelo's action. In Mann's opinion the fee difference between the Angelo's case and the cases she defended "might present an

insurmountable obstacle to [Arabia] in his attempt to have that fee approved." Regarding her opinion of the reasonableness of Arabia's fee, Mann stated:

"Having now dealt with a couple of—or several, actually, ADA claims myself, I find that they are not remarkably different from garden variety discrimination cases, with the exception that you are more likely to have doctor testimony. But that, in my opinion, does not account for the great disparity and the amount of fees charged by myself and that charged by Mr. Arabia. So I would have to say that I believe his fee is not within the range of a reasonable fee."

At the hearing before the panel, the opinions of other attorneys experienced in the field of employment discrimination litigation were admitted as evidence. Brian Grace, a practicing Wichita attorney, opined that $150 an hour is not unreasonable for an attorney of Arabia's experience and expertise. He stated that, in his opinion, based on the standards of Rule 1.5, the fees charged by Arabia in the Angelo's case were within the range of reasonable. Regarding charging a client for learning about an area of law, Grace stated, "If I'm educating myself in [an] area, I'd better be doing it on my nickel and not the client's. And I'd better tell him about it if I try to."

Regarding the Rule 11 research, Grace opined that Arabia spent too much time on the research, stating:

"I don't have a quarrel with taking a preliminary look at this stuff, but to spend substantial effort on Rule 11 in a case in front of Pat Kelly, I've practiced with him, tried cases with him and practiced in front of him so long it was unbelievable. Until you get a merits determination where the lawsuit is totally cratered, I just think—you're just not spending your time efficiently. It isn't necessarily that clear unless you've had a lot of experience in front of Pat Kelly or in front of the federal courts on a Rule 11, but some people would look at it, but not—I certainly would not—we would not have spent the amount of time on it that was spent on it by Paul Arabia, I know that."

Jim Lawing, a Wichita attorney and member of the National Employment Lawyers Association, testified on behalf of Arabia. Lawing considered Arabia to be a lawyer with a reputation for meticulousness. He opined that Arabia's fee of $150 an hour was reasonable. Lawing noted that upon initially learning of the total

fees in the Angelo's case, he was shocked. However, after reading the pleadings and looking at the billings, he was not shocked.

Gordon Warner, a plaintiff's attorney practicing in Topeka in the area of federal litigation testified. Warner stated that Arabia's fee of $150 an hour was within the range allowed by the federal court for a plaintiff's attorney's in civil rights cases. In Warner's opinion, the total fees charged by Arabia in the Angelo's case were not unusual or surprising.

John Stark, Arabia's senior legal assistant, testified regarding the Rule 11 research on the Angelo's case. Stark stated that the panel had an erroneous perception of the number of cases researched regarding Rule 11. He explained that most of the 149 cases listed in the case summary as fee shifting cases were cases actually researched in preparation of the lawsuit, but because the cases also contained information regarding fee shifting, he also classified those cases for research on Rule 11. Stark testified that when he began research on the Angelo's case, he knew nothing about the ADA. To familiarize himself with the act, he bought a book on the ADA and subscribed to the ADA reporter.

### Panel's Findings

The panel dismissed counts 3 (failure to protect client when terminating representation), 4 (dishonesty), and 5 (fitness) and concluded that Arabia had charged an unreasonable fee in violation of KRPC 1.5 and directed the parties to provide evidence of mitigation or aggravation. In a final hearing report filed April 9, 1999, the panel concluded that Arabia's supervision of his research team was deficient in that he allowed the team members to determine the issues they would look into and the parameters of their investigations without receiving specific instructions or directions. The panel acknowledged that Arabia testified that he met regularly with his research team, but the panel did not find Arabia's testimony credible that he controlled the parameters of the staff's research.

The panel found that Arabia was not knowledgeable in the Rule 11 area of law. Although the panel found that Arabia did not have a dishonest or selfish motive per se, it noted Arabia failed to supervise and direct the research and passed the research costs plus

overhead onto the client with a reckless indifference to the client's welfare. The panel also found that Arabia's substantial experience in the practice of law was an aggravating factor in that Arabia should have better managed the litigation and supervised the research.

Mitigating factors found by the panel included that Arabia had no prior disciplinary record; Arabia was willing to make restitution to the client; Arabia fully cooperated during the investigation and the hearing; Arabia submitted evidence of good character and reputation; Arabia claims to be remorseful; and Arabia's business, finances, and reputation have suffered some negative consequences as a result of the length of the proceedings.

The panel did not find that Arabia's or his legal assistants' hourly rates were unreasonable. The panel focused on the cumulative amount of the fee and found that Arabia's legal assistants were given too little direction and supervision regarding the quantity of research they performed on the case. Arabia filed exceptions to the final hearing report.

Arabia contends to this court that the panel's findings regarding his supervision of the legal assistants are not supported by the evidence. The Disciplinary Administrator's position is that there are facts to support the panel's findings, and those findings should not be disturbed. The Disciplinary Administrator asserts that the panel clearly did not find Arabia's testimony regarding his supervision of the legal assistants credible.

KRPC 1.5 (2000 Kan. Ct. R. Annot. 330) provides, in part:

"(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the ircumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent."

The panel was persuaded by the expert witness testimony that, overall, the fee charged in the Angelo's case was excessive. However, it was not convinced that the hourly rates charged by Arabia and his assistants were unreasonable. The bulk of the fees charged by Arabia was the result of the research conducted by the legal assistants, and experts testified at the hearing that much of that research was premature or unnecessary. The panel believed that either Arabia authorized premature and unnecessary research or Arabia failed to supervise his legal assistants. The panel concluded that Arabia failed to supervise the legal assistants.

## Federal Courts

The Disciplinary Administrator's complaint against Arabia was heard by this court on September 15, 1999. Because of the pending proceeding in the United States District Court, which included a determination of the amount of Arabia's fees, this court agreed not to rule on the complaint during the pendency of the matter.

On January 4, 2000, the United States Magistrate Judge denied Arabia's claim for payment and ordered Arabia to refund part of the attorney fees Angelo's had previously paid. Arabia appealed the magistrate judge's ruling to the United States Court of Appeals for the Tenth Circuit. On December 28, 2000, the Tenth Circuit affirmed the magistrate judge's order.

In the report on the federal court action, Arabia notified this court that immediately upon receipt of the decision of the Tenth Circuit Court of Appeals, he made arrangements to pay into court the full amount of the disallowed fees, together with interest from the date of Judge Reid's decision, thereby making restitution to his former clients, an important mitigating factor for consideration by this court.

Arabia points out to this court that the federal appellate court specifically denied Angelo's cross-appeal, which claimed that a larger repayment ought to have been ordered, thereby rejecting the opinion of Angelo's expert witness.

Arabia states that the gist of the appellate judgment and that of the federal district court was that, in the opinion of those two

courts, Arabia committed errors of judgment (a) in expending too much effort in his client's behalf (a conclusion which the respondent willingly accepts) or (b) in performing research work in advance of the time when that work would be needed. Neither court criticized the results obtained by Arabia's efforts and neither made any finding that he had failed in any manner to properly instruct or supervise the paralegals.

Arabia asserts that neither the Tenth Circuit Court of Appeals nor the district court below found, or even hinted, that (a) the fee charged by Arabia constituted an ethical violation; (b) Arabia had any intention to cheat or overreach his client; or (c) the fee charged was flagrantly excessive or shocking to the conscience of the court. Arabia respectfully reminds this court that the mere finding that a lawyer's requested fee is too high does not carry with it any implication of ethical impropriety, and of the following passages from *In re Quinn*, 25 N.J. 284, 289-90, 135 A.2d 869 (1957):

"The intangibles which bear upon the fairness of a fee [citation omitted] defy translation into simple mathematics. At times lawyers differ widely in their appraisals of the value of services, and it is not uncommon for a court to slash requests for allowances. It would be unthinkable to condemn a demand or charge as unethical merely because it exceeds another's judgment of what is fair. The touchstone is moral turpitude. [Citation omitted.] It is therefore not enough that a charge is excessive or unreasonable; rather it must be such to a degree which compels a finding that the attorney intended to overreach. [Citation omitted.]

"The test has been expressed in various ways. It has been said that the fee must be 'unconscionable,' [citation omitted] 'so exorbitant and wholly *disproportionate to the services performed* as to shock the conscience,' [citation omitted] [or] 'so excessive and unconscionable as to indicate that it could not have been charged in good faith,' [citations omitted]. There must be 'proof of misconduct accompanied by fraudulent and dishonest motives.' [Citations omitted.] . . . 'The amount of the fee which a lawyer deducts from his client's funds presents no ethical question unless it be so flagrantly excessive as to amount to misappropriation.' Opinions of the Committee on Professional Ethics and Grievances of the American Bar Association (1957), p. 108." (Emphasis added.)

Arabia states, notwithstanding that his hopes of a favorable outcome in the Tenth Circuit have been disappointed, he remains confident that this court will heed the precepts of *Quinn*, particularly after his comprehensive showing that the Disciplinary Ad-

ministrator signally failed to provide proof of any violation of the code of ethics.

We recognize the *Quinn* holding that a mere disagreement regarding the reasonableness of attorney fees does not constitute a basis for finding an ethical violation. Here, however, Arabia's fees were grossly disproportionate to the services performed, and Arabia employed questionable tactics in trying to collect the excessive fees. The rationale in *Quinn* does not, therefore, dissuade us from finding an ethical violation.

Arabia also respectfully reminds this court of the considerable collateral punishment he has endured, the enormous commercial damages he has suffered (not least because of the considerable time he has lived and practiced under a dark cloud of uncertainty), and the fact that complete restitution was made immediately upon learning of the decision of the Tenth Circuit Court of Appeals.

Finally, Arabia advises this court that he has taken the lessons of this unfortunate affair completely to heart; that his intensive efforts to exercise active billing judgment and restraint continue unabated (Arabia has previously furnished to the court a chart which chronicles his exercises in billing judgment in reducing fees and, upon request, he will provide a completely updated chart to show these continuing efforts), and that these continuing efforts, coupled with the damages already suffered, strongly suggest that an informal admonition would be an appropriate censure and a proper exercise in leniency by this court.

In disciplinary cases this court has a duty to examine the evidence and determine for itself the judgment to be entered. Although the report of the disciplinary panel and the findings of the United States District Court and the United States Tenth Circuit Court of Appeals are advisory only, they will be given the same dignity as a special verdict by a jury, or the findings of a Kansas trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony. See *In re Boone*, 269 Kan. 484, 498, 7 P.3d 270 (2000). We apply the rules stated above for considering the evidence, the findings of the panel, and the arguments of the parties in making our deter-

mination of whether violations of the KRPC exist and, if they do, deciding upon the appropriate discipline to be imposed. *In re Zimmerman*, 266 Kan. 115, 116, 965 P.2d 823 (1998).

To warrant a finding of misconduct, the charges must be established by clear and convincing evidence. Rule 211(f) (2000 Kan. Ct. R. Annot. 250). Clear and convincing evidence is not a quantum of proof but rather a quality of proof. It is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it. *Ortega v. IBP, Inc.*, 255 Kan. 513, Syl. ¶ 2, 874 P.2d 1188 (1994).

The panel, the federal district court, and the Tenth Circuit found that the fees charged by Arabia were unreasonable and the total hours spent in researching and preparing motions were not justified. We agree.

IT IS THEREFORE ORDERED that Paul Arabia be disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (2000 Kan. Ct. R. Annot. 224).

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that the costs herein be assessed to Arabia.